# 14-1128

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

OLA USTAD,

*Plaintiff-Appellant,*

—against—

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 747,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, NORTH AMERICAN AIRLINES,
GLOBAL AVIATION HOLDINGS, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

ROBERT L. HERBST
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, New York 10004
(212) 557-1616

*Attorneys for Plaintiff-Appellant*

# Table of Contents

Preliminary Statement ................................................................................1

Jurisdictional Statement...........................................................................8

Statement of Issues Presented ................................................................9

Procedural History and Decision Below ................................................9

Summary of Argument..............................................................................12

Statement of Facts ....................................................................................19

Argument ....................................................................................................31

1.  The Standard of Appellate Review on All Issues is *De Novo* ...........31

2.  Duty of Fair Representation Standards ..............................................32

3.  The Union's Failure to Notify, Counsel and Represent Plaintiff after
    the Flight Was a Violation of Its Duty of Fair Representation ..........40

4.  The Union's Unreasonable Investigation and Preparation of the
    Grievance and Conduct of the Arbitration Hearing, Including Its
    Failure to Investigate, Use and Present the AFIRS Data, Was a
    Violation of its Duty of Fair Representation to Ustad ......................48

5.  The Arbitrator's Decision that Plaintiff Acted Willfully Contrary to
    the Best Interest of Safety Need Not Be Given Binding Effect in this
    Case ..................................................................................................57

Conclusion ................................................................................................59

## Cases

*Air Line Pilots Ass'n Int'l v. O'Neill*,
    499 U.S. 65 (1991)............................................................ 32, 35, 36, 41, 53

*Banks v. Bethlehem Steel Corp.*,
    870 F.2d 1438 (9th Cir. 1989) .......................................... 36, 50, 51,

*Barr v. United Parcel Service*,
    868 F.2d 36 (2d Cir. 1989) ................................................... 43, 53

*Black v. Ryder/P.I.E. Nationwide, Inc.*,
    15 F.3d 573 (6th Cir. 1994) .................... 32, 33, 34, 35, 36, 37, 43, 51, 52, 53

*Cook v. Pan American World Airways, Inc.*,
    771 F.2d 635 (2d Cir. 1985) ........................................................43

*Foust v. IBEW*,
    572 F.2d 710 (10th Cir. 1978)
    *aff'd in part, IBEW v. Foust*, 442 U.S. 42 (1979) .................................. 38, 53

*Gorwin v. Local 282, IBT*,
    1997 U.S. Dist. LEXIS 3822 (S.D.N.Y. 1997) ................................ 34, 48, 57

*Gregg v. Chauffeurs, Teamsters and Helpers Union Local 150*,
    699 F.2d 1015 (9th Cir. 1983) .................................................. 38, 53

*Griffin v. International U., U.A.W.*,
    469 F.2d 181 (4th Cir. 1972) ................................................... 35, 43

*Henry E. & Nancy Horton Bartels Trust v. United States*,
    209 F.3d 149 (2d Cir.), *cert. denied*, 531 U.S. 978 (2000) ...........................31

*Hines v. Anchor Motor Freight*,
    424 U.S. 554 (1976).................................................. 33, 36, 41, 51, 53, 57, 58

*In re Publication Paper Antitrust Litigation*,
690 F.3d 51 (2d Cir. 2012) ..........................................................32

*Ince v. Nat'l Railroad Passenger Corp.*,
693 F. Supp. 1466 (S.D.N.Y. 1988) .............................................39

*Miller v. Gateway Transp. Co.*,
616 F.2d 272 (7th Cir. 1980) ........................................................56

*NLRB v. American Postal Workers Union*,
618 F.2d 1249 (8th Cir. 1980) ..................................... 35, 38, 42, 53

*NLRB v. Local 282, IBT*,
740 F.2d 141 (2d Cir. 1984) .............................................. 32, 38, 42

*Ruzicka v. General Motors Corp.*,
523 F.2d 306 (6th Cir. 1975),
rehearing denied, 528 F.2d 912 (6th Cir. 1975) (*Ruzicka I*),
649 F.2d 1207, 1211 (6th Cir. 1981) (*Ruzicka II*) ....................39, 41

*Samuels v. Air Transport Local 504*,
992 F.2d 12 (2d Cir. 1993) ......................................... 33, 34, 49, 51

*Strickland v. Washington*,
466 U.S. 668 (1984)......................................................................32

*Tenorio v. NLRB*,
680 F.2d 598 (9th Cir. 1982) ...................................... 33, 37, 50, 53

*Vacca v. Sipes*,
386 U.S. 171 (1967)................................................ 34, 35, 36, 37

*Webb v. ABF Freight System, Inc.*,
155 F.3d 1230 (10th Cir. 1998) .................................. 33, 36, 50, 53

*Willetts v. Ford Motor Co.*,
583 F.2d 852 (6th Cir. 1978) .......................................................................35

*Young v. United States Postal Service*,
907 F. 2d 305 (2d Cir. 1990) ................................................................ 38, 53

**FEDERAL RULES AND STATUTES**

28 U.S.C. § 1291 .......................................................................................8
28 U.S.C. § 1331 .......................................................................................8
28 U.S.C. § 1337 .......................................................................................8
28 U.S.C. § 2107 .......................................................................................8
29 U.S.C. § 185 .........................................................................................8
29 U.S.C. § 412 .........................................................................................8

**OTHER AUTHORITIES**

*Restatement (Second) of Trusts § 174* (1959) .........................................32

## PRELIMINARY STATEMENT

Plaintiff Ola Ustad respectfully submits this brief on his appeal from the Memorandum and Order of the United States District Court for the Eastern District of New York (Block, J.), entered on March 31 and April 1, 2014, granting summary judgment to defendants International Brotherhood of Teamsters, Local 747 and International Brotherhood of Teamsters [the "Union" or "Union defendants"] and dismissing the complaint.

This is a hybrid duty-of-fair-representation ("DFR") action originally brought against (1) the airline which terminated Ustad, one of its senior captains, in violation of its collective bargaining agreement ("CBA"), and (2) the Union, which breached its DFR to plaintiff in several ways.  The case was stayed against the airline when it filed bankruptcy petitions and was ultimately closed, A1993,[1] but continued against the Union, which, in its motion for summary judgment, did not quarrel with plaintiff's contention that he was terminated in violation of the CBA. Accordingly, the sole issue raised by this appeal is whether the district court erred in determining, as a matter of law, that the Union did not violate its DFR to Ustad.

Ustad was a long-time airline Captain with an unblemished record who was falsely accused by his airline of deliberately flying an airplane unsafely, for 51 seconds early on December 21, 2008, during a rarely-encountered and challenging

---

[1] References "A__" are to the Joint Appendix; references "SPA__" are to the Special Appendix.

takeoff procedure in adverse conditions.  Ustad was terminated on this false

charge, rendering him unemployable for 5.5 years and effectively devastating his

career.  The false charge of intentional misconduct -- motivated by the airline's

animus toward Ustad because of his union activity -- was based on (1) an

unreliable report by his First Officer, Rye Thompson, who became spatially

disoriented and confused during the takeoff, and (2) technical "AFIRS" data which

the airline alleged corroborated its allegation of intentional misconduct, but did

not.

The Union's DFR Violations

    After the flight, and in the grievance arbitration proceedings, the Union

violated its DFR to plaintiff in several ways.

    The First 24 Hours After the Flight

    During the critical first 24 hours after the flight, the local Union

representatives knowingly violated their duty to communicate with and represent

Ustad while they were consulting with, advising and representing Thompson.  This

deprived Ustad of an opportunity to file a report within that 24-hour window -- as

Thompson did upon the Union's recommendation -- which would have insulated

Ustad from termination or other airline discipline under the Aviation Safety Action

Program ["ASAP" and "ASAP report"].

At least four current or former Union officials have admitted under oath that the Union had a duty to communicate with, consult and represent Ustad as it did Thompson during this critical 24-hour period – a duty which went unfulfilled as the Union kept Ustad entirely in the dark until after the 24 hours had expired.

This duty arose from the Union's own operating rules and procedures, the Union's knowledge of the circumstances and of Ustad's jeopardy if he were not notified, and the case law discussed below requiring the Union to represent all involved members equally, without discrimination.

Then-Union President and General Counsel Ernest Sowell admitted that the Union had operating procedures that required its local representatives to instruct *both* pilot-members involved in a flying infraction incident to call Sowell's office immediately for legal counsel before making any statements to the Company so that ASAP reports could be filed within the 24-hour period. The new local leadership had been briefed on this rule but violated it. Had it been followed, Ustad would have been notified and would have filed his ASAP report before the 24-hour period expired and obtained ASAP immunity from discipline. A1900-01.

Even if those procedures had not been in place, the duty to inform Ustad would have arisen as soon as the Union representatives became aware, in their consultations with Thompson, that Ustad as well as Thompson might be in

disciplinary jeopardy.  As Duncan Parsons, then-Chair of the Union's Professional

Standards Committee, admitted, because it was obvious to the Union

representatives that Ustad might be disciplined, they had a duty to (1) inform him,

(2) bring the matter to the Professional Standards Committee where Ustad was a

member, (3) inform Sowell and the Union leadership in Houston, (4) consult with

Ustad and represent him just as they were consulting and representing Thompson,

and (5) recommend to Ustad that he file an ASAP report.  A1915-16.

Charles Carlson, the former local Union leader, admitted that there was no

justification for the Union's failure to fulfill its duty to inform Ustad of what was

happening, to bring Thompson's concerns to the Professional Standards

Committee, and to advise Ustad to file an ASAP report within the 24-hour period.

A1894-96.  Union Representative Christopher Bartlett also admitted that the Union

had such a "responsibility" and "duty" to Ustad, to make sure that he as well as

Thompson were "protected as much as possible."  A1176-77.

As Sowell and Parsons aver, this utter failure to represent plaintiff while

representing his First Officer was not only arbitrary, irrational, in violation of

Union rules and procedures, and without any justification or excuse, but also

discriminatory, in violation of the Union's duty to represent all of its pilots without

favor or discrimination.  A1902-03,1915-16.  It was also in bad faith, motivated as

it was by personal preference toward Thompson and prejudice or animus against

4

Ustad as a prior local Union leader whom these new leaders had recently replaced. This prejudice  is magnified by the fact that, while not speaking with Ustad to get his account of the flight, the Union was secretly reporting to the Company that he had apparently committed intentional misconduct, which he had not.  Sowell admits that reporting to the Company before advising Ustad and Sowell also constituted a DFR violation.  A1902.

In this litigation, the Union has not offered a justification for its failure to alert Capt. Ustad within the 24 hour period.  Had this most basic and fundamental DFR violation not occurred, there would have been no discipline, no termination, no grievance, no arbitration proceeding, and no occasion for the Union's subsequent DFR violations, discussed below, to have occurred.

The Few Weeks After the Flight

In the next few weeks after the flight, the Union not only failed to represent Ustad, but also facilitated his termination by the Company, depriving him of one last opportunity to file an ASAP report and to insulate himself from Company discipline.  The Union's representatives on the ASAP Program's Event Review Committee ["ERC"] had the right to request that the ERC issue an invitation to Ustad to file an ASAP report when it met for the first time on January 15, 2009 to accept Thompson's ASAP report.  Not only did the Union not make that request,

but one of its representatives falsely represented to the Committee that plaintiff had determined not to file an ASAP report, when in fact the Union, through Sowell, knew that Ustad was waiting for an ERC invitation to do so. Once that last opportunity passed, the Company was free to terminate plaintiff, and it did.

As Sowell avers, these failures also constitute a violation of the Union's DFR. A1902-03.

<u>The Post-Termination Arbitration Proceedings</u>

The Union and its attorney, Patrick Flynn, conducted an unreasonably shoddy, woefully inadequate investigation and defense of plaintiff in the arbitration proceeding challenging plaintiff's termination. Flynn failed to exercise the special care required in handling grievances concerning discharges, particularly one based on intentional misconduct -- deliberately flying an aircraft unsafely -- which would destroy plaintiff's career if upheld. The Union also did not take the steps necessary to permit it and its attorney – and the arbitrator – to make an informed and fair judgment as to whether Ustad had intentionally flown the aircraft unsafely, as charged.

Thus, Flynn and those assisting him, *inter alia*, (1) ignored exculpatory evidence in the AFIRS data of which they were aware themselves or informed by others, and generally failed to investigate and use the data, which would have

exonerated plaintiff in the arbitration proceeding, just as it did in the subsequent

parallel FAA suspension proceeding conducted by plaintiff's private counsel; (2)

failed to meet at all with plaintiff until the day before the arbitration hearing, only

talking to him on the phone once for an hour in all the months preceding the

hearing, essentially failing to prepare him to testify in his own defense; and (3)

failed to understand and explain to the arbitrator the demanding nature of the

rarely-encountered low-altitude-level-off-low-gross-weight-maximum-thrust

takeoff procedure -- and the challenges it presented to Capt. Ustad under the

adverse conditions at the time.

These lapses left plaintiff defenseless at the arbitration hearing, where the

Company presented the AFIRS data as if it corroborated the false charge against

Captain Ustad -- when it did not -- and where the Union attorney was unprepared

to cross-examine the Company witnesses on their mistaken interpretation of the

data, or to show the arbitrator how the data – the critical third "witness" in the

cockpit -- corroborated plaintiff's account of the flight and his defense that there

was no intentional misconduct in conducting the takeoff.

The Union also failed to present a simple winning argument of which it was

aware:  that the Company's reliance, in terminating plaintiff and defending that

termination in the arbitration hearing, upon the First Officer's written statement

(and testimony based on that statement) was a violation of the Company's

7

agreements under the ASAP program because the statement was cut and pasted from the First Officer's ASAP report.

Here, again, Sowell has admitted that these lapses constituted Union DFR violations.  A1903-10.

Because of these egregious failures, the arbitrator ultimately upheld the termination based on the demonstrably false charge of deliberate unsafe flying. Had the Union not failed the plaintiff in any of these ways, the outcome would have been different, and Captain Ustad would have been flying rather than unemployed for the last 5.5 years.  *Id.*  The detailed facts available in this substantial evidentiary record -- most notably the admissions of the Union officials and representatives themselves -- make clear that the Union violated its DFR. Ustad deserves a trial, and we ask this Court to remedy this miscarriage of justice by granting him one.

## JURISDICTIONAL STATEMENT

Federal question jurisdiction exists under 28 U.S.C. §§ 1331 and 1337, as plaintiff's claims in this DFR case arise under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, 29 U.S.C § 412.  This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2107 as plaintiff timely appealed on April 15, 2014 from a

final judgment dismissing plaintiff's complaint and disposing of all of the parties'
claims.

## STATEMENT OF ISSUES PRESENTED

Did the district court err in granting summary judgment to the Union
defendants and dismissing the complaint?

Are there disputed issues of material fact which, either singly or in
combination, warrant a trial on the question(s) of whether the Union violated its
DFR?

Did the district court err when it held that, because it found as a matter of
law that Ustad was represented fairly throughout the arbitration proceeding, it was
bound by the arbitrator's decision, even if erroneous, that plaintiff had committed
willful misconduct, thus rendering irrelevant Ustad's contention, in this DFR case,
that the Union violated its DFR by depriving him of an opportunity to insulate
himself from discipline by filing an ASAP report in the first 24 hours and in the
next few weeks after the flight?

## PROCEDURAL HISTORY AND DECISION BELOW

The complaint was filed in August 2010. A16. Issue was joined in October
2010. A37. Defendants initially moved for summary judgment in January 2011.

Docket 17.  Those motions were stayed pending discovery.  After discovery was completed, the Union renewed its motion for summary judgment.  Its new set of supportive papers, together with opposing and reply papers, were filed on March 22, 2013. A55-1992.  A brief oral argument was held on March 20, 2014.  The order granting summary judgment and dismissing the complaint was entered on March 31, 2014.  SPA1.  The memorandum explaining the reasons for the grant of summary judgment was entered on April 1, 2014.  SPA2-12.

The district court held that "the record does not show that the Union failed to represent [Ustad] fairly."  SPA9.  First, the court found that "there is no evidence that Flynn ignored or inadequately investigated the AFIRS data."  *Id.*  The court also held that there was no genuine dispute about what the AFIRS evidence revealed – excessive speed, aircraft nose dips and unusual wing flap behavior -- or that it was highly corroborative of Thompson's testimony.  SPA10.  The court concluded that Ustad had failed to show that Flynn's representation amounted to conduct that was arbitrary, discriminatory, or in bad faith," rather than a series of "tactical decisions that fall well short of a legally cognizable claim."  SPA3,11.

Second, having found that plaintiff was represented fairly throughout the arbitration proceeding, the court found that the arbitrator's decision that he acted willfully contrary to the best interest of safety "must stand" – apparently as a matter of incontestable fact in this litigation even if it is not actually true -- and that

therefore the issue of the ASAP report is "irrelevant, because reporting intentional conduct provides no immunity." SPA11. The court further found the issue of what advice, if any, the Union gave to Ustad about the filing of an ASAP report and the circumstances of his failure to file one was "immaterial" because, "even if he had been found to have acted unintentionally, (1) Ustad was aware of the ASAP reporting requirements, (2) he was aware that a reportable incident had occurred, and (3) his first contact with the Union occurred after the 24 hour reporting period." SPA11. Finally, the court found that because there is no dispute that Ustad's first contact with the Union was more than 24 hours after the end of the flight, "the Union could not have impacted his ability to make a report during the initial 24-hour window." SPA12.

The district court did not address Ustad's contention that the Union did not fairly represent him in the few weeks after the flight by (1) failing to request that the ERC issue him an invitation to file an ASAP report and (2) falsely communicating to it that plaintiff had determined not to file an ASAP report when it knew that plaintiff was awaiting the ERC's invitation to do so, thereby depriving him of another opportunity to insulate himself from Company discipline. The court also did not address Ustad's contention that the Union violated its DFR by failing to present the simple winning argument – of which it was aware -- that the Company's reliance, in terminating Ustad and defending that termination in the

11

arbitration hearing, upon Thompson's written statement (and testimony based on that statement), was a violation of the Company's agreements under the ASAP program because the statement was cut and pasted from Thompson's ASAP report.

This appeal followed.

## SUMMARY OF ARGUMENT

The district court ignored or failed to address the genuine issues of material fact which should have precluded the grant of summary judgment to the Union, and not just on the three unaddressed issues just mentioned.

The court simply ignored the admissions of Union officials Sowell, Bartlett, Parsons and Carlson that the Union failed to fulfill its duty to inform Ustad of what was going on in the first 24 hours after the flight so that he could have insulated himself from discipline by filing an ASAP report. It was precisely *because* the Union failed to contact Ustad within that 24 hour window that the Union negatively "impacted his ability to make a report during the initial 24-hour window." SPA12. Sowell, Parsons and Carlson admit that there was no justification or excuse for this astounding, utterly irrational, discriminatory and completely arbitrary failure to represent plaintiff at this critical stage, and that it constitutes a violation of the Union's DFR. Bartlett admitted that if he had it to do over again, he would "absolutely" fulfill this duty by calling Ustad within the 24

12

hour period, and Phil Kemp, another of the new local Union representatives, admitted that he did not know of a possible reason for Bartlett's and the Union's not having notified Ustad or having brought him into the discussion.  A932-34.

The court also ignored evidence that this failure was in bad faith, motivated by (1) close friendship and personal preference for Thompson, (2) close friendship with NAA's Chief of Flight Operations, David Currier, and (3) hostility and ill will toward Ustad as a member of the prior local pilot Union leadership these new local leaders had just replaced.  A912-14,934-39,1174-75.  These are all disputed issues of material fact properly precluding summary judgment.

The court also failed to address evidence that plaintiff did not believe that a reportable safety event may have occurred until after the 24 hour window had expired, when he was finally notified that Thompson was going to file an ASAP report and make a report to the Company.  A922,966,970-71,983 (no flap overspeed); A925 (AFIRS data showing normal rather than abnormal takeoff with no compromise of safety); A929,1939 (Ustad thought there was no flap speed exceedance and no reportable safety event).  It was only after the 24-hour period, when he was notified by Sowell of what was afoot and advised that he could not file an ASAP report but that he could and should file a NASA report, that he wrote in that report that a safety event may have occurred.  A929-32,1939-40.

13

Accordingly, the NASA report is not evidence of what Ustad knew or believed during the 24 hour ASAP window.

"The objective of the ASAP is to encourage air carrier and repair station employees to voluntarily report safety information that may be *critical* to identifying potential *precursors to accidents*."  A1782 (*emphasis supplied*). Accordingly, not every unusual event or technical regulatory violation is a "reportable safety incident."  SPA12.  The fact that the aircraft briefly flew at a speed exceeding 250 knots did not constitute a reportable safety incident as long as there was no flap overspeed that could damage the aircraft and no violation of the 2,000 foot clearance or any other event that could have caused an accident.  Here, there was none, the aircraft was never in any danger, and safety was never compromised.  A980-83 (expert testimony that takeoff was normal and Ustad succeeded in flying the aircraft in a safe, efficient manner).  Nor did the unlogged EICAS messages constitute reportable safety incidents since the EICAS messages, which are status rather than warning messages, appeared only later, in cruise flight, not during the takeoff, and the NAA maintenance technician on board advised the pilots that they were not significant and not anything to worry about.  A926-27.

Indeed, the court ignored evidence that Ustad was not aware in the first 24 hours after the flight that there had been any overspeed at all.  Thompson (1) never expressed a word of concern during the flight, about any speed exceedance or

14

anything else, (2) appeared to Capt. Ustad to be satisfied by Ustad's assurances after the flight that there had not been a flap overspeed and nothing unsafe had occurred, (3) admitted that his conversation with Ustad made Thompson question what he had actually seen for sure, and whether any airplane limitations had actually been exceeded, (4) admitted that if he had known that the flaps had been fully retracted at 227 knots (which the AFIRS data confirmed), he would not have been concerned about a flap or slat overspeed, and (5) had not immediately reported either to the Union or to the Company that any safety event had occurred but instead went home and went to sleep, permitting the aircraft to be flown again. A929-31,855-56.  Aircraft traffic control ("ATC") had been in communication with the pilots and was monitoring its speed throughout the takeoff, but there is no evidence that ATC ever advised the pilots of any overspeed.  Even the next morning, neither Thompson nor his union representatives immediately reported any concerns; they were unsure as they consulted for 12 hours as to whether a reportable safety event had occurred, cogitating over what had actually occurred during the flight without consulting the Captain and senior pilot on the flight, and without consulting the Professional Standards Committee, during their lengthy consultations.  A929-31.

The district court also failed to address evidence that Ustad actually had little familiarity with ASAP procedures despite his involvement in negotiating the

brand new NAA ASAP program, and deferred to Sowell, who had written the

program and had been familiar with the program at other airlines for years.   While

the ERC could invite a pilot to file an ASAP report after the 24-hour window had

expired, Sowell instructed Ustad that he had to await an actual invitation from the

ERC to submit such report.  The ERC never issued such an invitation to Captain

Ustad, and the Union's representatives on the ERC – who could have procured

such invitation -- never sought one on his behalf.  Instead, they falsely informed

the ERC that he had determined not to file an ASAP report, effectively colluding

with the Company to keep Ustad from getting another opportunity to file an ASAP

report.  A946-47.  Here, too, Sowell admitted that this constituted a DFR violation.

A1902-03.  Surely there are disputed issues of material fact which preclude

summary judgment.

The district court also ignored the record when it found that "there is no

evidence that Flynn ignored or inadequately investigated the AFIRS data."  SPA9.

Flynn's time record reveals no time at all devoted to the AFIRS data, no time

reviewing it, no time discussing it, no time conferring about it, no time considering

it.  A950-52,1845-51.[2]  The court's finding to the contrary – that "Flynn had the

AFIRS data, reviewed its analysis, and spoke with various Union representatives

_____

[2] The Union also submitted an initial set of summary judgment papers never mentioning the
AFIRS data nor making any argument at all that Flynn had ever spent one minute reviewing or
thinking about the AFIRS data.  A1854-67.

before he made a strategic choice to focus on excluding" the AFIRS data, SPA9, is therefore based on defendants' version of disputed facts. Rather than a "strategic choice" or "tactical judgment," SPA10, Flynn's effort to exclude the AFIRS data without exploring and using its exculpatory evidence, of which he had both actual and constructive notice, was a failure to investigate and exercise judgment. A950-57.

Moreover, the district court apparently labored under a critical misapprehension about what the arbitration hearing was all about. The issue to be determined at that hearing was not whether the airplane had been flown at excessive speed, or whether the pitch fluctuated, or whether the flaps were retracted at a low altitude. SPA-12. The sole issue to be determined was whether Ustad had intentionally and willfully flown the aircraft contrary to the best interest of safety; or, as he contended, inadvertently fell a bit behind the aircraft while handling a challenging takeoff procedure in adverse conditions. A288,948,950, 960-62. And on that issue of intentional misconduct, the AFIRS data was the critical "third witness in the cockpit." The district court failed to address evidence that Flynn and the Union ignored exculpatory evidence on that issue in the AFIRS data of which they were aware or informed. A952-56. Also overlooked below was Flynn's deposition admission that he never considered whether he could use the AFIRS data to exonerate plaintiff, or whether that evidence was more

17

consistent with inadvertence than deliberate misconduct.  A950-51,956.  Thus, the

court erroneously rejected plaintiff's contention that, rather than making a

considered exercise of tactical judgment, there was evidence that Flynn and the

Union failed to consider and exercise judgment -- the very definition of arbitrary

and irrational conduct in the prosecution of a grievance arbitration proceeding.

Applicable case law eminently supports our contention that these failures

constitute a violation of the DFR.  The district court committed the error of

accepting defendants' version of the facts as a matter of law rather than

recognizing the many disputed issues of material fact warranting a trial.

The court also erred in holding, *sua sponte*, that because it found as a matter

of law that Ustad was represented fairly throughout the arbitration proceeding, it

was bound by the arbitrator's (erroneous) decision that plaintiff committed

intentional misconduct, thus rendering irrelevant plaintiff's contention, in this DFR

case, that the Union defendants had violated their DFR by depriving him of an

opportunity to file an ASAP report in the first 24 hours and in the next few weeks

after the flight.

# STATEMENT OF FACTS[3]

On December 21, 2008, Ola Ustad had a 22-year unblemished career flying commercial aircraft, never before accused of any infraction.  He had been a senior Captain flying for NAA for more than eight years.  Under Sowell's direction, he had headed the local NAA pilot's negotiating committee for four years of contentious negotiations leading up to NAA's first CBA with its pilots in May 2008, which barely passed over substantial opposition and friction among the pilot group.  Plaintiff and the old pilot Union leadership resigned shortly thereafter, and the new pilot Union leaders, Michael Cole, Christopher Bartlett, Philip Kemp and Shawn Meyer, took over, the last two being the Union's representatives on the ERC.  A911-14.

Kemp was best friends with NAA's Chief of Flight Operations, David Currier, who also had friendly relations with the other new pilot Union leaders.  Currier was the senior decision-maker in the Company's disciplinary actions against plaintiff.  Bartlett was also personally close to Rye Thompson, Capt. Ustad's First Officer on the flight in question.  A913-14,934-36,938-39.

---

[3] The facts in the light most favorable to plaintiff are contained in Plaintiff's Response to Defendants' Rule 56.1 Statement of Facts and Statement of Additional Facts, A844-995, and particularly in the Statement of Additional Facts, A911-95.  Because of this brief's page limitation, we respectfully request that this Court review the comprehensive factual recitation therein.  Most of the citations herein are to that Statement, where the numerous underlying supporting citations to the depositions, declarations and exhibits may be found.

That flight, on December 21, 2008, from 1:20 a.m. to 2:42 a.m., was a ferry flight (no cargo, no passengers, only pilots, cabin crew and a maintenance technician on board), with light fuel, at night, with a 500-700 foot ceiling. The initial altitude clearance was only to 2,000 feet (low-altitude-level-off), the plane was empty (low gross weight), and a tailwind required the use of full power (maximum thrust). Accordingly, the required takeoff procedure was a low-altitude-level-off-low-gross-weight-maximum-thrust takeoff ["LALOLGWMTTO"], a particularly demanding and challenging procedure, hardly ever required or performed, not described in NAA cockpit manuals, and on which NAA did not train its pilots. A917-19.

Because a B-767's engines generate enormous thrust, the basic problem with the LALOLGWMTTO is that, while airspeed builds up and the airplane climbs very fast, the pilot has to stay below the 2,000 foot clearance because of possible aircraft above, and the flaps have to be started up quickly before reaching the 250-knot airspeed limitation. A921-22.

Because the aircraft was equipped with an Automated Flight Information Recording System ["AFIRS"], the AFIRS data, recorded each second, would have permitted the Union and its attorney to make an analysis of the 51 seconds of the takeoff in dispute between liftoff and autopilot engagement at 2,000 feet, and correlate it with plaintiff's account of the flight. A915-16,918-28. That account,

and how the technical data supports it, may be found at A918-28, and further
discussed at A892-98,904-06,952-54,961-71,974-78.

When graphed into a climb profile, the AFIRS data indicates that the takeoff
was normal, not abnormal.  It proceeded normally through the roll, rotation and
gear-up, with positive rates of climb and acceleration.  Cognizant of the challenges,
Ustad did a fairly slow rotation, adjusted the initial trim setting, and called for flap
retraction, when he first noticed F/O Thompson not immediately responsive.
Plaintiff then raised the nose to 13 degrees of pitch, to try to slow the accelerating
speed, lightly and smoothly, as he did with all subsequent pitch changes.  He then
received an altitude capture, or ALT CAP, directing him to lower the pitch to
capture the 2,000 foot altitude restriction, which he did, as he was supposed to do,
but which necessarily increased the airspeed.  Ustad then did three things to slow
the plane down.  He increased the pitch, began to bring back the power by
manually retarding the throttles, and called for Climb Thrust and VNAV, a reduced
power setting.  F/O Thompson was supposed to implement the Climb Thrust and
VNAV commands, but he did not respond.  Therefore, Ustad did it himself,
removing his hand for a few seconds from manually reducing power, which caused
the still-engaged autothrottles to immediately return to 101% power (from 71%).
He then returned his hand to the throttles to manually reduce power, all the way
down to 62%, which continued until just before 2,000 feet, when a higher

clearance was obtained from Air Traffic Control, Climb Thrust VNAV was reselected for the new altitude, and the autopilot was engaged for the remainder of the climb to cruise altitude, 35,000 feet.

There was no deliberate airspeed exceedance or unsafe flying.  For most of the 51 seconds he was flying the plane before engaging the autopilot, Ustad was trying to slow the aircraft down, and all pitch changes were light and smooth, not heavy or abrupt.  Safety was never compromised, and there was never any danger of an accident; he got the flaps lever to full retraction well below 250 knots, the aircraft always maintained a positive (climb) pitch, and most critically, did not bust the 2,000 foot clearance.  At most, plaintiff found himself briefly and inadvertently (and not unsafely) falling a bit behind the aircraft, with a partially unresponsive co-pilot, in a demanding LALOLGWMTTO in Instrument Meteorological Conditions ["IMC"].  A927-28,940,952-54, 965-71,983.  Because there was no flap overspeed, there was no damage to the aircraft, which in fact was found to be undamaged when it was first inspected after the flight. A855-56,940,952-53.

Later, during cruise at altitude, two Engine Indicating and Crew Alerting System ["EICAS"] maintenance status messages relating to the landing gear, flaps and slats appeared.  Plaintiff inquired of the maintenance technician on board and was informed they were neither significant nor worrisome.  Upon landing at JFK, Ustad also discussed them with a second maintenance technician receiving the

22

aircraft at JFK, who also advised that they were not of concern and that maintenance would take care of them. Neither plaintiff nor the maintenance technicians ever logged those messages in as they were supposed to, but no one was disciplined for that procedural infraction, and that was not the predicate for plaintiff's termination, **which was solely the allegation that he willfully, deliberately and intentionally flew the aircraft unsafely**. A926-27,948,960-62.

Thompson said nothing to Ustad during the entire flight suggesting any concern. At the gate after the flight, Thompson expressed concern about the EICAS messages, and Ustad told him that he did not think any flap exceedance had occurred (and thus no cause for concern). Thompson thanked Ustad, and **Ustad thought he had resolved Thompson's concerns**. Ustad (correctly) believed no safety event had occurred. A861,929,1939.

But starting at 8 a.m. that morning, Thompson consulted with Bartlett and one other Union representative for 12 hours. Although Thompson had been disoriented, confused and uncertain about what he had really observed, the Union representatives rejected the options of (1) calling Ustad and discussing with him what had occurred and whether there was any cause for concern about the aircraft's airworthiness, and (2) bringing the matter before the Union's Professional Standards Committee, which also would have involved Ustad. Rejecting these options violated Union operating rules and procedures. Instead, after consulting

among themselves, the local Union leadership advised Thompson to make a report to the Company, and to file an ASAP report within 24 hours after the flight ended to insulate himself from discipline and protect his own career.  A929-39, 1900-01.

Pursuant to the brand new ASAP program, inaugurated at NAA only two months before the flight, the Company, Union and FAA had agreed that no pilot who has timely filed an ASAP report which is later accepted by the ERC would be disciplined.  Kemp and Meyer were then the Union's representatives on the ERC. A916-17,946.  An ASAP report is timely if filed within the 24 hour window after the flight, which in this case ended on December 22, 2008 at 2:42 a.m.  A917-18. Neither Bartlett, Cole, Kemp nor Meyer, who were all aware of what was going on, called Capt. Ustad; instead, they kept him completely in the dark until the 24-hour window ended, thereby facilitating his prosecution and eventual termination by the Company.  A930-39.  **Bartlett admits that this was a violation of the Union's "duty" and "responsibility" to represent Ustad.  Sowell, Carlson and Parsons agree and admit that there is no justification or excuse for this discriminatory and incomprehensible failure of representation.  Kemp admits that it would have been appropriate to bring Ustad into the conversation and does not know of a possible reason for plaintiff's not having been notified**. A932-34.  Had plaintiff been notified, he would have filed an ASAP report and been insulated from any discipline, let alone termination, since every single one of

24

at least 360 ASAP reports filed since the inception of NAA's ASAP Program has been accepted by the ERC.  A850-51,917-18,934,1570.  Thus, absent this initial DFR violation, there would have been no termination, no grievance, and no arbitration hearing or decision.  Ustad would have been flying all these years.

**Not only did the Union fail to represent and inform plaintiff of what was afoot, but Kemp was privately and secretly informing Currier of the Union's ongoing consultations with Thompson, and falsely reporting to Currier that Ustad was aware that the aircraft was potentially unairworthy because of a likely and intentional flap/slat exceedance and had failed to report a serious safety hazard to the Company; and that Ustad stood "potentially indicted" by his own Union**.  A934-39.  This, too, was an egregious violation of the Union's DFR to plaintiff.  A938,1902.

Ustad finally received some limited information on December 22, 2008, after the 24-hour ASAP window had expired.  Sowell advised plaintiff that it was too late to file an ASAP report and that he would now have to await an invitation from the ERC to file an ASAP report.  Sowell advised Ustad to file a NASA report, which has a 10-day window, but only protects against FAA regulatory action, not Company discipline.  Plaintiff did so that day.[4]  A940-41.  Ustad relied

---

[4] Ustad's NASA report reported only a "possible" flap speed exceedance and states that Ustad was not aware of any such speed exceedance during the takeoff.  A494.  That report obviously

25

on Sowell's advice because Sowell was the Union's top lawyer and expert on ASAP, having proposed it and handled all aspects of the ASAP and the negotiations between the Union and the Company which created it at NAA in or about October 2008. A848-49,1905. Although Ustad was a pilot negotiating representative until the CBA was ratified in June 2008, he had not familiarized himself with the ASAP, its language had never become the subject of the contract negotiations, and Sowell had not explained the program or its component terms to plaintiff during negotiations. *Id.* Cole told Ustad he agreed that it was too late to file an ASAP report. A941. Later that afternoon, after they had had the aircraft inspected and found it undamaged, Currier and NAA Chief Pilot Christopher Hewitt advised Ustad that they had removed him from flying status. A940-42.

At the January 15, 2009 ERC meeting, although the Union knew that Ustad's ability to file an ASAP report and insulate himself from discipline now hinged upon an invitation from the ERC, and that he was awaiting such invitation, Kemp and Meyer did not request the ERC to issue one. Instead, they falsely told the ERC that they had spoken to plaintiff and asked him to complete an ASAP report and that he had chosen not to do so. A946-47. Accordingly, the ERC did

---

reflects what Ustad had learned *after* the 24-hour ASAP window had expired – that Thompson was still concerned that a flap speed exceedance may have occurred. In fact, no such flap speed exceedance had occurred. Nothing in the NASA report evidences any intentional misconduct.

not issue the invitation,[5] simply accepted Thompson's ASAP report without investigation, and accepted all other ASAP reports submitted at the ERC meeting. *Id.* As Sowell admits, this also constitutes a violation of the Union's duty of fair representation to plaintiff. *Id.*, A1902-03. The Company was now free to fire Ustad, and it did, on February 2, 2009, predicated solely on the charge of willfully and intentionally flying the aircraft unsafely. A948-49.

Once the grievance was filed, Flynn was retained as the Union's attorney to represent Ustad. His investigation of the false charge of intentionally flying unsafely, and his preparation of the defense on that charge for the hearing, was utterly and irrationally inadequate under the circumstances. Plaintiff's commercial flying career was at stake, and there was exculpatory technical evidence available which Flynn and those assisting him, Herron and Parsons, were aware of but ignored and generally failed to investigate. Minimal investigation of this technical evidence available in the AFIRS data could have and would have exonerated Capt. Ustad. A949-71,974-79,985-94.

---

[5] While Lori Weller, the Company employee now starting to function as the ERC Administrator, left a phone message for Ustad telling him that he might think about filing an ASAP report, Ms. Weller did not identify herself as involved with the ERC, and she admitted that, at the time she called, the ERC had not yet met and had not authorized her to invite plaintiff to file an ASAP report. Because he had been advised by Sowell that he had to await an invitation from the ERC, and no such invitation had yet been received, Ustad did not file an ASAP report after he received the message. A868-69.

That particular lapse was especially egregious since Flynn knew that, since Thompson had been disoriented and unsure of what he had seen, the Company would be relying heavily on the AFIRS data as the disinterested crucial "witness" in the cockpit, and that the AFIRS data had the capacity to (1) support or rebut the Company's false charge of intentional misconduct, (2) corroborate or rebut plaintiff's account of the takeoff, and (3) convict or exonerate him. A954-57.  Yet knowing that the AFIRS data contained exculpatory evidence – that it did not show any wild or abrupt changes in pitch, that it showed that the flaps had been cued to retract, and did fully retract, well below 250 knots, and that the data was consistent with plaintiff's handling of the LALOLWGMTTO and its particularities – the Union attorney did not investigate the data, have it evaluated, prepare to cross-examine on it, or use it affirmatively at all in defense of plaintiff.  A950-57.  **In fact, Flynn's time records do not mention the AFIRS data or reflect any time discussing the data**.[6]  A950-51.  As a result, Flynn (and Ustad) were left defenseless when the AFIRS data was admitted and misleadingly used by the Company at the hearing wrongfully to convict plaintiff of deliberately unsafe flying.  A951-52,960-71.  Flynn could not and did not cross-examine any of the Company witnesses on the data or put on any witnesses other than plaintiff, whose

---

[6] In the Union's first set of motion papers served in January 2011, when it was aware of plaintiff's claim that Flynn and the Union did not look into the AFIRS data, no mention was made at all of the AFIRS data or of any preparation about the AFIRS data when discussing Flynn's, Herron's and the Union's preparation for the arbitration hearing).  A952,1334,1337, 1854-67.

direct examination was brief, perfunctory and woefully inadequate. Flynn also

declined to put on Parsons, his technical expert, who was sitting right there telling

Flynn he could provide helpful testimony. A952-91,1919-21.

Flynn's representation also suffered from other basic failures. As the

arbitration hearing transcript makes clear, Flynn never interviewed any of the crew

on board, and never took the time or made the effort to investigate and prepare to

present plaintiff's detailed account of the flight, or the demands and challenges of

the LALOLGWMTTO, or how rarely it is encountered and performed, or the lack

of training and proficiency on that takeoff among pilots at NAA. A951-54,957-60.

This is partly because of the unreasonably small amount of time Flynn devoted to

his investigation of the grievance and his preparation for the arbitration hearing in

the 4.5 months from his retention in April to the hearing in late August 2009. Prior

to August, he spent only 11.5 hours on the matter, and his total time prior to the

day before the hearing was 21.5 hours. A950. Flynn only talked to Capt. Ustad

once on the phone, in July, and met with him only on the day before the hearing,

where there was no preparation by Flynn of plaintiff's testimony on any specific

subject, or any preparation for direct or cross-examination. A896,958-59. Flynn

was unresponsive to plaintiff's and Herron's suggestions that an expert be retained

to analyze the AFIRS data, although both Flynn and Herron were unqualified to do

so. A953,955-56. Flynn asked Parsons to be his technical expert a few weeks

before the hearing, but never sent him the AFIRS data, never asked him anything about the AFIRS data, never asked him to look into whether there was any exculpatory evidence in it, ignored exculpatory information Parsons (and others) provided, and never asked him to testify at the hearing to explain to the arbitrator what a LALOLGWMTTO was and why it is challenging, especially with a momentarily disoriented and unresponsive co-pilot, no training, and no briefing materials in the cockpit describing the procedure.  A950-54,958.

Flynn also failed to present the simple winning argument that Thompson's ASAP report also insulated plaintiff from Company discipline.   Thompson's statement to the Company, which was simply cut and pasted from his ASAP report, could not be used either to discipline plaintiff or to defend the discipline in the arbitration hearing since the ASAP Memorandum of Understanding ["MOU"] provided that an ASAP report cannot be used to initiate or support any Company disciplinary action.  Without Thompson's statement and testimony, there was insufficient evidence to support Ustad's termination.  Sowell was aware of this simple winning argument, but because Flynn failed to consult with Sowell, he failed to prepare and raise this argument at the arbitration, although it was raised successfully at the later FAA hearing.  A957,1903-04.  Sowell admits that this lapse "also constitutes a violation of the Union's duty of fair representation."  *Id*. In the subsequent FAA hearing, that argument was successfully made by Ustad's

private attorney, resulting in an NTSB order not to consider Thompson's statement or any testimony referring to it.  *Id.,* A990-93.

As a result of these and other irrational and arbitrary failures, A959-60, the arbitrator found facts which were demonstrably untrue and upheld the termination on the false charge of deliberately flying the aircraft unsafely, a finding which devastated Capt. Ustad's career.  A968-71, *see generally* A960-71.  While the subsequent FAA proceeding, conducted by plaintiff's private counsel without such lapses, exonerated plaintiff on the same false charge of intentional misconduct and finally resulted in no sanction, A971-94, Capt. Ustad has been deprived of his career and livelihood for 5.5 years.  A994.  This is a travesty of justice, and cries out for remediation here.

## ARGUMENT

## I

## The Standard of Appellate Review on All Issues is *De Novo*

The standard of review on the grant of summary judgment is *de novo*. *Henry E. & Nancy Horton Bartels Trust v. United States*, 209 F.3d 149, 149 (2d Cir.), *cert. denied*, 531 U.S. 978 (2000).  Summary judgment will be affirmed

> only if, after construing the evidence in the light most favorable to the
> non-moving party and drawing all reasonable inferences in its favor

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" . . . . [W]hen the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, the question of what weight should be assigned to those inferences remains within the providence of the fact-finder at a trial.

*In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 62 (2d Cir. 2012)

(*citations omitted*).

## II

## Duty of Fair Representation Standards

A labor union's duty of fair representation is "akin to the duty owed by other fiduciaries to their beneficiaries[,]" like the duty owed by an attorney to a client. *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 75 (1991). "Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith. *See*, *e.g., Restatement (Second) of Trusts § 174* (1959) (trustee's duty of care); *Strickland v. Washington, 466 U.S. 668, 686 (1984)* (lawyer must render "adequate legal assistance")" *Id.* Actions for a union's breach of its DFR depend for their rationale on the union's otherwise-complete control over the handling of an employee's grievance. *NLRB v. Local 282, IBT,* 740 F.2d 141, 145 (2d Cir. 1984); *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994).

Fair representation in arbitral proceedings "means an honest, thorough effort to present [grievant's] claims throughout the arbitral process in a manner best calculated to secure his rights under the collective bargaining agreement." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 16-17 (2d Cir. 1993) (holding failing to investigate grievance and to present it adequately to Board of Adjustment constituted *prima facie* case of union's breach of duty of fair representation where, *inter alia,* union neglected to discuss case or possible witnesses with Samuels until day of hearing).

A labor union must "undertake reasonable investigation to defend a member from employer discipline." *Black,* 15 F.3d at 585, *citing Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554 (1976) (plaintiff who proves an erroneous discharge, and union's breach of DFR tainting arbitrator's decision, is entitled to remedy against Union). While the thoroughness and amount of investigation required of a union to meet its DFR depends on the circumstances of each case, *see Webb v. ABF Freight System, Inc.,* 155 F.3d 1230, 1239, 1241 (10th Cir. 1998) (union breached DFR "by failing to undertake an adequate investigation under the circumstances"), unions need to exercise special care in handling grievances concerning discharges. *Tenorio v. NLRB*, 680 F.2d 598, 602 (9th Cir. 1982). The failure to present favorable evidence during the grievance process constitutes a breach of the DFR when that evidence probably would have brought about a

different decision. *Black,* 15 F.3d at 585 (failure to contact and call the one witness who could have effectively and objectively corroborated Black's testimony on a vital matter constituted violation of DFR). *See also Gorwin v. Local 282, IBT*, 1997 U.S. Dist. LEXIS 3822 *23-31 (S.D.N.Y.) (Sotormayor, J.) (denying summary judgment to union where (1) "the level of the Union's preparation and investigation is a material issue in dispute subject to trial," and possibly "egregiously and unreasonably poor, and therefore arbitrary," including the failure to discuss the case adequately with plaintiff until just before the arbitration hearing, the failure to interview a crucial witness and the failure to read material documents; and (2) the union lawyer allegedly failed to put important evidence before the arbitrator and failed to elicit important testimony from plaintiff at the arbitration hearing).

"[T]he duty of fair representation requires the union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Black,* 15 F.3d at 584*, quoting Vacca v. Sipes,* 386 U.S. 171, 177 (1967). With respect to processing grievances, a union may not do so "in perfunctory fashion." *Vacca,* 386 U.S. at 190-91; *Samuels,* 992 F.2d at 16-17 ("When a union . . . perfunctorily presses a meritorious claim, it is held to have acted arbitrarily.").

"[A] union breaches its duty of fair representation if its actions are *either* 'arbitrary, discriminatory, *or* in bad faith." *Id., quoting O'Neill,* 499 U.S. at 67.[7] "Thus, the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty[,]" plaintiff only has to show one. *Id.*

Judging whether a union has acted discriminatorily or in bad faith ordinarily presents simple and straightforward issues. *Id. See, e.g., NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1256 n. 12 (8th Cir. 1980) (actionable discrimination need not be "based on race, color, national origin, age, sex, or union affiliation," and need not be accompanied by "hostile motive"; it was enough that union official's personal preference to terminate Berry's reassignment, treating her differently from other employees, impaired her interests); *Willetts v. Ford Motor Co.,* 583 F.2d 852, 855 (6th Cir. 1978) (failing to notify plaintiff of union's decision to drop his grievance would be bad faith if proved); *Griffin v. International U., U.A.W.,* 469 F.2d 181 (4th Cir. 1972) (refusal to process discharge grievance because of personal friendship between union leader and employer's manager motivated by bad faith).

---

[7] Although *O'Neill* framed its standards for breach of the DFR in the context of a dispute over the union's performance in contract negotiations, *O'Neill's* standards govern a union's conduct in contract administration and enforcement as well. *Black,* 15 F.3d at 584.

However, whether a union's actions are arbitrary is more complex and must be judged in light of the factual and legal landscape at the time of the union's actions. *Id.* To be arbitrary, there must be more than a mere error of judgment, *Hines v. Anchor Motor Freight,* 424 U.S. 554, 571 (1976), but union behavior that is sufficiently far outside a wide range of reasonableness, or irrational, is arbitrary, *id., citing O'Neill,* 499 U.S. at 67. "A union must nonetheless undertake reasonable investigation to defend a member from employer discipline." *Black,* 15 F.3d at 585, *citing Hines* (union cannot process a grievance in a "perfunctory manner"[8]).

The thoroughness and amount of investigation required of a union to meet its DFR depends on the circumstances of each case. *See, e.g., Webb,* 155 F.3d at 1239, 1241 (union breached DFR "by failing to undertake an adequate investigation under the circumstances," including failing to review company evidence before the arbitration hearings so that plaintiff's representative in those hearings was caught by surprise and may have been affected in his ability to raise questions about the company's allegation); *Banks v. Bethlehem Steel Corp.,* 870 F.2d 1438, 1442-45 (9th Cir. 1989) (summary judgment denied where decision not to interview or call witnesses placed union in situation where it either could not or

---

[8] "Perfunctory" means acting in an apathetic or indifferent fashion, or without concern or solicitude, or giving a claim only cursory attention. *Webb,* 155 F.3d at 1240-41 (failure to explore possible retaliatory motive at the hearing may be perfunctory representation).

36

would not make an informed and fair judgment regarding the merits of member's discharge; "duty of fair representation requires that *before* assessing the merits of a grievance, a union must have an ample basis upon which to make such an assessment"; whether the failure to interview and call witnesses prejudiced terminated employee was an issue for trial); *Tenorio,* 680 F. 2d at 601-02 (union's decision not to interview two witnesses or terminated employees was so grossly inadequate as to transcend poor judgment in discharge grievance, which require unions to exercise special care).

The failure to present favorable evidence during the grievance process may constitute a breach of the DFR when that evidence probably would have brought about a different decision, *Black,* 15 F.3d at 585 (failure to contact and call the one witness who could have effectively and objectively corroborated Black's testimony on a vital matter constituted violation of duty of fair representation).  Union actions or omissions which are either arbitrary, discriminatory or in bad faith are actionable if they seriously undermine the arbitral process, *Vacca,* 386 U.S. at 190, or "tainted the decision of the hearing panel."  *Black,* 15 F.3d at 585.

The breach of fiduciary duty of fair representation through discriminatory, bad faith or arbitrary conduct is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, are egregious, fall short of minimum standards of fairness to the

37

employee, and are unrelated to legitimate union interests. *Local 282, IBT,* 740 F.2d at 146-48. Such omissions include the failure to notify affected members of critical events or developments "necessary to protect their interests in their job." *Id.* (failure to communicate terms of arbitration award to all affected employees was breach of DFR). *American Postal Workers Union,* 618 F.2d at 1255 ("a union may not impair individual employee interests on the basis of personal preferences. And if a union representative makes no effort to communicate with the persons directly affected by its actions and takes action without investigation or adequate notice and opportunity to be heard, these acts and omissions may constitute a breach of the duty of fair representation.") *(citations omitted)*; *Foust v. IBEW,* 572 F.2d 710, 713-15 (10th Cir. 1978), *aff'd in relevant part, IBEW v. Foust*, 442 U.S. 42, 47 (1979) (filing grievance out of time was arbitrary because it was an act done without adequate principle or an act not according to reason and judgment, even though time available to the Union was limited).

Union conduct is arbitrary either if it is "without rational basis" or if the union's reasons for it are simply too insubstantial to justify it. *Young v. United States Postal Service,* 907 F. 2d 305, 309 (2d Cir. 1990) (it is Union's burden to show that justifiable reason for its tardy filing of plaintiff's grievance); *Gregg v. Chauffeurs, Teamsters and Helpers Union Local 150,* 699 F.2d 1015, 1016 (9th Cir. 1983) (rejecting union's contentions that its decision to withdraw appellees'

grievances was a rational, tactical decision based on its attorney's opinion that pursuing the grievances weakened the other members' position before the arbitrator, where grievances were supported by reasonable and legitimate arguments and no reason to believe that the arbitrator could not sort out the merits of the several claims).

Inability to provide a rational or justifiable explanation for a union's actions or omissions may ground liability for violating the DFR, especially if the unexplained union action has barred an employee from access to an established union-management procedure. *See, e.g., Ruzicka v. General Motors Corp.,* 523 F.2d 306, 310 (6th Cir. 1975), rehearing denied, 528 F.2d 912 (6th Cir. 1975) (*Ruzicka I),* 649 F.2d 1207, 1211 (6th Cir. 1981) (*Ruzicka II)* (unexplained or unjustified failure to timely file grievance statement is a clear example of arbitrary and perfunctory conduct amounting to unfair representation). *See also Ince v. Nat'l Railroad Passenger Corp.*, 693 F. Supp. 1466, 1476, 1479 (S.D.N.Y. 1988) (even where evidence of collusion between union and employer was slight, Union had a duty to guard uninformed employee against prejudice).

# III

# The Union's Failure to Notify, Counsel and Represent Plaintiff after the Flight Was a Violation of Its Duty of Fair Representation

The entire new pilot Union leadership -- Philip Kemp, Mike Cole, Chris Bartlett and Sean Meyer -- were called, consulted by, or involved in the discussions with Thompson in the first 24 hours after the flight. This was the critical period during which Thompson determined to file an ASAP report, and during which plaintiff could have and would have filed an ASAP report similarly protecting himself from company discipline if the Union had not kept him entirely in the dark about Thompson's concerns and intentions. A929-34. In fact, Thompson testified that, in the hours he consulted with his Union representatives, they specifically *rejected* two options which would have put Capt. Ustad on notice: (1) calling him to inform him of Thompson's concerns and to ask about his perceptions of the flight, and (2) consulting the Union's Professional Standards Committee, which would also have involved informing plaintiff. A929. Those representatives also violated Union rules and procedures requiring them immediately to inform both pilots of a report of a possible safety infraction so that they could seek legal advice before the 24-hour period expired from Sowell, who would have advised Ustad to file an ASAP report. A1900-01.

The Union offered no justification below for such an incomprehensible lapse of representation, not to speak of fair play and common sense.  Bartlett admits that this "duty" and "responsibility" of the Union -- to inform plaintiff about what was going on during those first 24 hours so that he could have taken the same steps Thompson did to insulate himself from discipline by filing an ASAP report -- went unfulfilled.  So do Parsons, Carlson and Sowell, who all aver that this constitutes a violation of the Union's DFR.  A932-34.

This Union failure was arbitrary because it was "incomprehensible," outside any conceivable range of reasonableness, irrational and unjustifiable.  A932-38 (Kemp – who, during the 24-hour ASAP window, had secretly reported to the Company the false canard that Ustad may have intentionally damaged the aircraft -- admitting that he could not think of a possible reason for not having notified Ustad and having brought him into the discussion; Parsons admitting that it was "completely astounding," unacceptable, without reason or excuse, and "incomprehensible"; Sowell admitting it was arbitrary, unreasonable and unjustifiable).  *See Hines, O'Neill, supra.*  This egregious and unexplained omission barred Ustad from access to an established union-management procedure, ASAP immunity, which would have insulated him from any discipline at all, let alone termination.  *Ruzicka, supra.*

The Union's failure here was also discriminatory. A932-34 (Parsons admitting as much, and that the Union violated its duty to represent both pilots without favoring Thompson or discriminating against Ustad). *See American Postal Workers Union, supra.* Because the Union's omission to notify plaintiff and advise him to file an ASAP report within the 24-hour period fell far short of minimum standards of fairness to the employee, was unrelated to legitimate union interests, and was a failure to notify an affected member of critical events or developments "necessary to protect [his] interest in [his] job," it is actionable as a violation of the Union's DFR even if it had not been calculated to harm Ustad. *Local 282, IBT, supra.*

Here, however, the Union's omissions *were* arguably calculated to harm Ustad, because the Union representatives were aware of the consequences to Ustad if they kept him in the dark and he did not file a timely ASAP report. They knew that if Thompson reported to the Company and filed an ASAP report but Ustad did not, that he would be left vulnerable to termination or other discipline.

Moreover, ample evidence exists permitting the jury to find that this failure was motivated by personal preference, hostility or ill will toward Ustad as a member of the prior local pilot Union leadership they had just replaced. *See NLRB v. American Postal Workers Union, supra.* Indeed, there is evidence that at least one Union representative, Kemp, secretly reported, consulted and colluded with

NAA management within the 24 hour period and thereafter, providing false information damaging to plaintiff, and facilitating plaintiff's termination by keeping him from filing an ASAP report, both within the 24-hour window and subsequently, thereby protecting the Company's ability to prosecute and terminate Ustad.  A934-43,946-47.

This collusion – unaddressed by the district court -- is itself sufficient to constitute a bad faith failure of representation.  *See Griffin, supra.*  In short, the Union's violation of its duty to Ustad was in bad faith as well as arbitrary and discriminatory.  *See, e.g., Black, supra* (duty of fair representation requires "honest . . . effort . . . calculated to secure employee's rights" and to serve "the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.").[9]

Faced with these material facts, many of which are undisputed, the Union's arguments – and the district court's -- ring hollow.  First, while it is true that it is the pilot, not the Union, which must file the ASAP report under the ASAP program, Thompson had said nothing to plaintiff about any concerns during the entire flight.  During the brief conversation they had after the flight, Thompson's

---

[9] *Compare* two easily distinguished cases cited by defendants, *Barr v. United Parcel Service*, 868 F2d 36, 42, 44 (2d Cir. 1989), where there was "not a scintilla of evidence" presented to support the allegations of bad faith, and *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635 (2d Cir. 1985), where the interests of two groups of union members had each been vigorously defended by the union, even though both groups could not "win" everything they wished in matters of seniority.

concerns seemed to be focused on the EICAS messages, which two maintenance

mechanics, one on board and one at JFK, had indicated were of no concern.  When

Ustad told Thompson that he did not think there had been any flap overspeed,

Thompson seemed to accept it and thanked Ustad for speaking to him about it.

A926-27,929.[10]  Accordingly, Ustad reasonably believed that Thompson had no

continuing concerns and that there had been no reportable safety event.  *Id.*  There

was thus no reason for Ustad to file an ASAP report unless and until he was

informed that Thompson still purportedly had concerns, was making or had made a

report to the Company of a safety event, and was going to or had filed an ASAP

report.  This is precisely what the Union knew, and irrationally concealed from

plaintiff.  That concealment reeks of personal preference, hostility, ill will and bad

faith.

There is thus no merit to the Union's contention, and the district court's

finding, that the evidence conclusively establishes that plaintiff knew within the

24-hour window of a reportable safety event, or knew or should have known from

Thompson's comments at the end of the flight that Thompson still believed that

such event had occurred, and that plaintiff should therefore have submitted an

ASAP report of his own within that window.  SPA11-12.

---

[10]   In fact, there had been no flap/slat exceedance, and the aircraft had not been damaged in any
way. A940,952-54,964-66,970-71.

The Union's and court's reliance on plaintiff's NASA report, *id.,* is misplaced. The NASA report was filed after the 24-hour ASAP window had expired, shortly after plaintiff had learned for the first time from Sowell that he might be under investigation, and after Sowell had advised him that it was too late to file an ASAP report but to file the NASA report, which has a 10-day window. That certainly does not demonstrate that Ustad knew within the 24 hour ASAP window that there had been a reportable safety event or that he was in disciplinary jeopardy requiring the filing of an ASAP report prior to his first conversation with Sowell, when the Union was concealing from Ustad that he was in such jeopardy.

The court also cites the pilots' failure to enter the EICAS messages in the logbook, SPA12*,* but in light of the fact that Ustad brought those messages to the attention of two NAA maintenance technicians and were advised by both that the messages were of no concern, that was at most a procedural infraction that did not constitute a reportable safety event; indeed, Ustad was not terminated for that infraction, and neither the maintenance technicians nor Thompson were disciplined for that violation. A926-27,948,962.

The Union and court also speculate, with no record support, that any experienced commercial pilot would have known that a possible noncompliance with airline safety regulations had taken place. SPA12. However, that ignores the evidence that (1) the EICAS messages did not constitute a reportable safety event,

45

(2) Ustad reasonably believed that no flap speed or any other exceedance had taken place, (3) Thompson himself was unsure about what had actually occurred after talking to Ustad after the flight, and (4) Thompson did not immediately file either an ASAP report or a report to the Company after the flight.  Instead, being only "possibly" worried about the aircraft and not knowing if any aircraft limitation had been exceeded, Thompson went to sleep, woke up, and then consulted with his Union representatives for approximately 12 hours trying to figure out whether a reportable safety event had occurred, what his options were, and what course he should pursue.  He did not file his own ASAP and NASA reports, and make an oral report to the Company, until the latter part of the 24-hour ASAP period, and then only upon the recommendation of his Union representatives.  A929-30.  It was because the Union concealed all this from plaintiff, and utterly failed to represent him by making the same recommendation to him during this critical period, that Captain Ustad did not file his own ASAP report and obtain disciplinary immunity.

While disciplinary immunity under the ASAP program is not an established right, the record reflects an established *practice* at NAA in which every ASAP report filed has been accepted by the ERC – all 360 to 400 reports.  A917.  Thus, if Ustad had not been kept in the dark by his Union until the 24-hour window had closed, he would have timely filed an ASAP report, it would have been accepted

by the ERC as Thompson's was, and he, too, would have received disciplinary immunity.

Finally, the Union contended below that plaintiff could have filed an ASAP report at any time before the ERC's January 15, 2009 meeting. However, it is undisputed that the Union's own president and general counsel, Sowell, advised Ustad flatly that, since the 24-hour window had expired, it was too late to file an ASAP report, and that Ustad had to await an invitation from the ERC to file an ASAP report. A940-41. The Union now apparently contends that its own advice was wrong, but it cannot dispute that plaintiff received and relied upon it. Thus, even if *arguendo* its advice were wrong (which itself is a disputed factual issue, *see* A851-53), the Union is responsible for it and should not be heard to suggest otherwise.[11] During the next few weeks, when because of that advice Ustad did not file an ASAP report, the Union's representatives failed to procure that invitation and falsely informed the ERC that plaintiff had determined not to file an ASAP report, they again violated their DFR. Because the ERC's invitation would have opened up another 24-hour window, with which plaintiff, now on notice, would have complied, and because the ERC would have accepted an ASAP report from him, as it has in every case, these additional DFR violations are as actionable

---

[11] Thus, whether Thompson's report was sole source or non-sole source is a red herring; the critical point is that, absent the Union's concealment, and collusion with the Company, plaintiff would have timely filed his ASAP report within the 24 hour window and would not have been terminated or disciplined. *See* A869.

as the violations during the initial 24-hour period after the flight, for the same reasons, and on the same authorities.

What this record reveals is a Union which deliberately failed to represent and assist Ustad from the initial 24 hours after the flight through his termination, deliberately concealed from Ustad critical facts that would have enabled him to gain disciplinary immunity, secretly reported falsehoods to the Company and actually colluded in the Company's efforts to terminate him.  It is a record replete with DFR violations, warranting reversal.

## IV

## **The Union's Unreasonable Investigation and Preparation of the Grievance and Conduct of the Arbitration Hearing, Including Its Failure to Investigate, Use and Present the AFIRS Data, Was a Violation of its Duty of Fair Representation to Ustad**

The only issue to be decided at the arbitration hearing was whether Ustad had committed intentional misconduct by deliberately flying the aircraft unsafely. Substantial material factual disputes as to the reasonableness and adequacy of the Union's investigation, preparation and hearing presentation on that issue preclude summary judgment here, as it did in *Gorwin*.  Clearly, there was no "thorough effort to present [plaintiff's] claims throughout the arbitral process in a manner

best calculated to secure his rights" under the CBA not to be terminated on what both Ustad and the Union believed was the false charge of intentionally flying the aircraft unsafely. *Samuels, supra.*

Particularly irrational was Flynn's, Herron's and Parsons's ignoring the exculpatory information in the AFIRS data of which they were aware or informed, and failing generally to analyze and evaluate that data for evidence that could buttress plaintiff's account of the flight and exonerate him. A950-57. Herron and/or Parsons noticed evidence in the data that (1) Ustad was trying to slow the aircraft down, (2) there were only normal pitch changes, not the large changes in pitch nor abrupt pitching the nose over that the disoriented Thompson had reported, and (3) the flaps and slats had been cued to retract well before 250 knots, supporting plaintiff's contention that he did not deliberately fly the aircraft to exceed the flap/slat limit. *Id.* But because Flynn never asked Parsons about the AFIRS data and appeared to be totally uninterested in it, Parsons, Flynn's technical representative, never mentioned any of this to Flynn. Neither, apparently, did Herron, who told Flynn only that he was not an AFIRS expert and believed that such expert might be able to refute the Company's contention both as to air speeds and pitch attitudes. Yet according to his time records, Flynn, who had been told a month earlier by Carlson that the AFIRS data did not show any wild pitches, never

spent one minute looking at, thinking about, talking about, or trying to investigate or evaluate, the AFIRS data. *Id.*

This was not a considered exercise of judgment, but rather the failure to consider and exercise judgment, since Flynn has admitted that he never considered whether he could use the AFIRS data to exonerate plaintiff, or whether that data was more consistent with inadvertence than deliberate misconduct. A955-57. Indeed, Flynn testified that that was something he would *never* consider. A956.

These admissions render erroneous the Union's argument, and the district court's holding, that moving to exclude the AFIRS data without making the effort to evaluate and understand it was merely a tactical decision. Acting without reason, consideration and judgment is the very definition of "irrational" and "arbitrary." Failing to review critical Company evidence, especially when the Union was on notice that it might be exculpatory rather than incriminating, leaving the grievant defenseless at the arbitration and losing a case that would otherwise have been won, was arbitrary and a violation of the DFR. *Webb, Banks, Tenorio, supra.*

Spending hardly any time in preparation, having only one telephone call with Ustad and one meeting with him the day before the hearing, not preparing him to testify, not acquainting oneself or the arbitrator with the challenges of the

50

LALOLGWMTTO that was so essential to plaintiff's account of the flight and defense of the charge of intentionally unsafe flying, securing Parsons as a technical expert but irrationally not calling him to testify about those challenges – all were patently inadequate, unreasonable, and arbitrary under the circumstances here, especially in this termination grievance where Capt. Ustad's future career and livelihood were at stake because of the nature of the charge.  If ever a grievance and arbitration proceeding was defended in "perfunctory fashion," *Hines, Samuels, Black, supra,* this was it.

As a result of these failures, Flynn and the Union could not make an informed and fair judgment themselves as to the merits of the grievance; therefore, they were not in a position to persuade the arbitrator of its merits.  *Banks, supra.* Without (1) really debriefing and preparing plaintiff to testify, (2) understanding and presenting the challenges of the LALOLGWMTTO, and (3) analyzing and presenting the exonerating AFIRS data, the Union lacked the "ample basis" required to assess the injustice of plaintiff's discharge, and to persuade the arbitrator of it.  This was a violation of its DFR to plaintiff.  *Banks, supra.*

As this evidentiary record shows, absent these egregious lapses, the outcome would have been different, as it was in the FAA proceeding, because the evidence available to the Union and its attorney would clearly have shown that plaintiff was innocent of the charge of intentional misconduct.  *Black, supra.*  Accordingly, the

Union's failures were on vital matters which seriously undermined the arbitral

process and tainted the decision of the arbitrator.  *Black, supra.*

The Union – and the court below -- rely heavily on the suggestion that Flynn

consulted with Herron for less than one hour at a meeting in Houston a few weeks

before the hearing, looked at the AFIRS data for a part of that hour, decided that it

was a "mixed bag," and did not need to investigate it.  SPA9.  However, it is a

disputed fact as to whether such meeting ever occurred.  No such meeting is

reflected in Flynn's time record, no notes or emails in this entire record refer to

such meeting or discussion, and in their first set of motion papers, when the Union

knew that the failure to look into the AFIRS data was one of our claims, no

mention whatever was made of such meeting, or of any discussion about or review

of the AFIRS data.  A885-87.

Even if *arguendo* there was such a meeting and a very short superficial look

at the data, no meaningful review and investigation of the AFIRS data occurred; it

was patently inadequate -- simply too insubstantial to justify the decision to look

no further.  A885-88.  This is especially true since, *inter alia,* (1) neither Flynn nor

Herron had ever reviewed or worked with AFIRS data themselves and were

unqualified to evaluate it, (2) they were aware of the crucial role the data was

likely to play in the arbitration proceeding, and of exculpatory evidence in that

data, (3) plaintiff and his wife had requested that they have an expert review the

data, and (4) Herron had advised Flynn that such an expert review would be helpful in refuting important elements of the Company's case. *Id.; A950-56. Young, supra.*

Determining to move to exclude evidence in hand that could conceivably exonerate one's grievant-client, without first investigating it, was, like the other failures described above, "so grossly inadequate as to transcend poor judgment," *Tenario, supra,* and utterly unreasonable and irrational. For all these reasons, defending this termination grievance, which required "special care," without investigation of the AFIRS data was arbitrary and therefore a breach of the Union's DFR. *Hines, O'Neill, Black, Webb, Foust, American Postal Workers Union, Gregg, supra.[12]*

While the court cited admissions by plaintiff a month after the flight that the aircraft was flown at excessive speed during the takeoff and that he failed to record the EICAS messages in the maintenance log, SPA6,[13] they were not material to the

---

[12] In *Barr v. United Parcel Service*, 868 F2d 36, 42, 44 (2d Cir. 1989), cited by the court below, Mem. 9, the alleged failure to call witnesses at a preliminary stage was deemed tactical, and not a breach of duty, specifically because witnesses were *never* called in that stage of grievance proceedings, good reasons supported that policy, and the value of the allegedly withheld evidence was doubtful. That case is obviously distinguishable from plaintiff's here.

[13] The court also noted Ustad's arbitration hearing testimony that he had been trained on the low altitude level off take off procedure in 2000 on a Boeing simulator, and that he had performed the procedure twice, once at Pope Air Force Base, where the current incident occurred. SPA10. However, initial training on a low altitude level off in a simulator eight years before the flight is not the same as performing a low altitude level off procedure at low gross weight and maximum

sole issue to be determined at the arbitration – whether plaintiff had *intentionally*

flown the aircraft too fast and unsafely – and it was on that issue that Flynn,

Herron and Parsons knew that the AFIRS data contained exculpatory evidence,

which they ignored.  A889-96.  While there were pitch changes and speed

exceedances reflected in the data, they were similarly irrelevant to the sole issue of

intentionality versus inadvertence.  A883-84.  What *was* relevant was the

exonerating evidence in the AFIRS data that, *inter alia,* the pitch changes were

light, smooth and normal, and that Ustad was **trying to slow the aircraft down**.

A962-71.

Nor is it "only hypothetical speculation" that, absent the Union's egregious

lapses in its preparation and conduct of the hearing, the outcome would have been

different.  SPA10.[14]  It is obvious from his decision that the arbitrator got the facts

wrong, without understanding the challenges faced by plaintiff in the

LALOLGWMTTO, with a disoriented and non-responsive co-pilot, and without

understanding that, *inter alia*, one can see in the data evidence of Thompson's non-

---

thrust, at night, in IMC conditions.  While Capt. Ustad testified that he had performed a low altitude level off twice before, once at Pope, he also testified that he had never performed one with a tailwind requiring maximum thrust, with a lightly loaded aircraft, at night, in IMC conditions.  A918-19.

[14] Here the district court misapprehended our argument below.  It was not that the result of the arbitration hearing would have been different because the arbitrator would have "discredited the AFIRS data."  SPA10.  Far from discrediting the AFIRS data, our argument was, and continues to be, that the arbitrator would in all likelihood *have credited the AFIRS data,* and the exculpatory evidence in it, and would have acquitted Ustad of the false charge of intentionally flying the aircraft too fast and unsafely.

responsiveness and Ustad's manual retardation of the throttles evidencing his intention to slow the plane down rather than fly too fast.  A968-71.

In fact, the AFIRS data disproved every factual finding the arbitrator made adverse to Ustad, showing that Ustad (1) did not hold the brakes and abruptly release them after advancing the throttles, (2) did not suddenly drop the nose and then suddenly pitch up, going from a climb to a down, and pitching back up like a roller coaster, (3) did not prompt flap-slat retraction at 280 knots (but rather at 198 knots, well below the 250-knot limitation), (4) did not reach 330 knots at an altitude below 5,000 feet, and (5) did not make two unexplained nose dives on takeoff.  A968-70.  It is also obvious that the arbitrator was relying on the Company's mistaken interpretation of the AFIRS data because Flynn had not prepared to rebut it, just as he had not prepared to offer evidence on the challenges of the LALOLGWMTTO, or prepared plaintiff, his sole witness, to testify.  *Id.*  In short, Flynn failed to offer a real defense to the false charge, because he had not investigated and prepared himself to do so.

While the arbitrator stated that the AFIRS data was not the "basis" for the discipline, it *was* the basis for his finding of intentional misconduct; for it is clear that he would not have upheld the termination absent the AFIRS data he mistakenly thought corroborated Thompson and demonstrated intentional

misconduct, when in fact it showed just the opposite.  A927-28,950-57,960-71,974-94.

While the court below noted that plaintiff received the AFIRS data a couple of weeks before the arbitration, SPA7, plaintiff was, as he told Flynn, not conversant with the AFIRS data and was in no position to evaluate it himself.  He (as well as Herron) asked Flynn to get an expert to do it, and Flynn should have but did not do so.  A955-56.  These are all disputed factual issues to be resolved by the jury.

Flynn also failed to prepare and present the simple winning argument that Thompson's ASAP report also insulated Ustad from discipline, and that Thompson's statement to the Company and his testimony based on it could not be used either to discipline him or to defend the discipline at the arbitration hearing.  A957,990-91,993.  This was also not a tactical decision, but rather an unthinking one, as Flynn never considered it, and failed to consult with Sowell, who was aware of it.  A957,1903-04,1909.  *See Miller v. Gateway Transp. Co.*, 616 F.2d 272, 276-77 (7th Cir. 1980) (reversing grant of summary judgment where union simply failed to urge the absence of a warning letter that was a prerequisite to employee's suspension).

**V**

## The Arbitrator's Decision that Plaintiff Acted Willfully Contrary to the Best Interest of Safety Need Not Be Given Binding Effect in this Case

The court below held, *sua sponte* and without citing any authority, that because Ustad was fairly represented throughout the arbitration proceeding, the arbitrator's decision that Ustad acted "willfully contrary to the best interest of safety" must be given binding effect in this DFR case, thereby rendering the Union's failures discussed in Point III irrelevant because an ASAP report does not provide disciplinary immunity for intentional misconduct. SPA11. That holding was erroneous, putting the cart before the horse.

Here, as in *Gorwin*, at *15-16, the Union has never contested the proposition that plaintiff was discharged without cause and in violation of the CBA, because *inter alia*, he did not intentionally fly the aircraft too fast or unsafely, and there is no doubt that plaintiff has assembled sufficient evidence to create a triable issue of fact as to the impropriety of his discharge. Accordingly, the arbitrator's "findings to the contrary are not dispositive, because if the process has fundamentally malfunctioned by reason of the bad faith [or discriminatory, or arbitrary] performance of the union, then his determination no longer contractually binds" Ustad. *Id., citing Hines,* 424 U.S. at 569 (*internal quotation marks omitted*). *See*

*Hines,* 424 U.S. at 570 ("we cannot believe that Congress intended to foreclose the employee from his § 301 remedy otherwise available against the employer if the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct"), and 424 U.S. at 572 (Stewart, J., concurring) ("proof of breach of the Union's duty of fair representation will remove the bar of finality from the arbitral decision that Anchor did not wrongfully discharge the petitioners.").

The "contractual processes" in this case includes the ASAP program, which was a contractual program and process between the Company and Union (and FAA), as well as the Union's obligation to treat and represent all its members non-arbitrarily and without discrimination, hostility, ill will or bad faith.

Here, these processes "fundamentally malfunctioned" not just because, as argued above in Point IV, Ustad was *not* represented fairly throughout the arbitration proceeding, but also because the Union failed in its duty of fair representation so egregiously right from the beginning, in the first 24 hours after the flight, and in the weeks thereafter, as noted in Point III above.  Had the Union not failed Ustad *ab initio*, he would not have been terminated and there would have been no grievance, no arbitration hearing, and no adverse finding of intentional misconduct.  Therefore, giving binding effect to the arbitrator's finding of

intentional misconduct is not warranted, and our arguments in Point III should be considered and determined based on the facts and law cited therein.

## **CONCLUSION**

The order granting summary judgment to the Union defendants and dismissing the complaint should be reversed, and the case remanded for trial, together with such other and further relief to plaintiff as this Court deems just and proper.

Dated:      New York, New York

August 15, 2014

HERBST LAW PLLC

By:   /s/ Robert L. Herbst

Robert L. Herbst (RH-8851)

420 Lexington Avenue

New York, New York 10170

(646) 543-2354

rherbst@herbstlawny.com

*Attorneys for Plaintiff Ola Ustad*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,969 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: August 15, 2014                    Respectfully submitted,


                                          /s/ Robert L. Herbst
                                          Robert L. Herbst

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Order of the Honorable Frederic Block Appealed From,
    dated March 31, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

Memorandum of the Honorable Frederic Block Appealed From,
    dated April 1, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-2

**SPA-1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
OLA USTAD,

                Plaintiff,

    -against-

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 747; INTERNATIONAL
BROTHERHOOD OF TEAMSTERS; NORTH
AMERICAN AIRLINES; and GLOBAL
AVIATION HOLDINGS, INC.,

                Defendants.
---------------------------------------------------------x

**ORDER**
10–CV-3894 (FB) (RER)

*Appearances:*
*For the Plaintiff:*
ROBERT L. HERBST, ESQ.
Herbst Law PLLC
75 Howell Avenue
Larchmont, NY 10538

*For Defendants:*
YVONNE L. BROWN, ESQ.
Spivak Lipton LLP
1700 Broadway, 21st Floor
New York, NY 10019

EDWARD GLEASON, ESQ.
Int'l Brotherhood of Teamsters
25 Louisiana Avnue, NW
Washington, DC 20001

**BLOCK, Senior District Judge:**

      Defendant International Brotherhood of Teamsters, and International Brotherhood of

Teamsters, Local 747's motion for summary judgment is granted and the complaint is

dismissed.  A written decision will follow.

            **SO ORDERED.**

           /S/ Frederic Block

           FREDERIC BLOCK
           Senior United States District Judge

Brooklyn, New York
March 31, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
OLA USTAD,

                   Plaintiff,

      -against-

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 747; INTERNATIONAL
BROTHERHOOD OF TEAMSTERS; NORTH
AMERICAN AIRLINES; and GLOBAL
AVIATION HOLDINGS, INC.,

                 Defendants.

----------------------------------------------------------x

**MEMORANDUM**
10–CV-3894 (FB) (RER)

*Appearances:*
*For the Plaintiff:*
ROBERT L. HERBST, ESQ.
Herbst Law PLLC
75 Howell Avenue
Larchmont, NY 10538

*For Defendants:*
YVONNE L. BROWN, ESQ.
Spivak Lipton LLP
1700 Broadway, 21st Floor
New York, NY 10019

EDWARD GLEASON, ESQ.
Int'l Brotherhood of Teamsters
25 Louisiana Avnue, NW
Washington, DC 20001

**BLOCK, Senior District Judge:**

        Plaintiff Ola Ustad ("Ustad") brings this action against defendants North American Airlines (the "Airline"), Global Aviation Holdings ("GAH"), International Brotherhood of Teamsters ("IBT"), and International Brotherhood of Teamsters Local 747 ("Local 747") (collectively, IBT and Local 747 will be the "Union").  He alleges that the Airline violated its collective bargaining agreement ("CBA") with the Union, and that the Union breached its duty to represent him fairly.  On March 31, 2014, the Court issued an order granting summary judgment for the Union defendants and stated that this written opinion would follow.[1]

        Ustad, a pilot, was terminated from his employment by the Airline, and contends that the Union attorney who represented him at his arbitration proceeding conducted an inadequate evidentiary investigation.  He also argues that the Union failed to contact him in

---

[1]Claims against the Airline and GAH were administratively closed because of their filing of chapter 11 bankruptcy petitions.  *See* Dkt. Nos. 43 and 82.

**SPA-3**

the first 24 hours after a flight incident to advise him to file a safety report that would have immunized him from his eventual discharge for violating safety regulations. Underlying Ustad's arguments is his belief that, because the Federal Aviation Administration ("FAA")—in a proceeding separate from the arbitration—found that he did not act intentionally, he was fired improperly by the Airline and that the Union is liable for not having represented him successfully.

In support of their summary judgment motion, the Union defendants argue that Ustad knew about the safety reporting procedure and had ample opportunity to file a report. They also argue that the Union attorney made tactical decisions that fall well short of a legally cognizable claim.

The Court has considered the parties' memoranda, reviewed the extensive record, and heard oral argument on the motion. For the reasons set forth below, summary judgment is granted for the Union defendants.

## I.

The following undisputed facts are taken from the parties' Rule 56.1 statements and the record evidence.

Early on December 21, 2008, Ustad and his co-pilot, First Officer Rye Thompson ("Thompson"), took off from Pope Air Force base ("Pope") in North Carolina to JFK Airport in New York. Their takeoff deviated from a standard takeoff in many respects. Ustad operated the plane at a speed in excess of 250 knots while climbing from 2,000 to 9,000 feet; the nose of the aircraft was raised and lowered (i.e., the pitch fluctuated) atypically; and he retracted flaps at a low altitude. After takeoff, two Engine Indication Crew Alerting System ("EICAS") messages appeared, one related to flaps and the other related to slats. These events were captured by an Automated Flight Information Recording System ("AFIRS"). Nothing else unusual occurred for the remainder of the flight.

**1. Safety Incident Reports**

Shortly after landing, Thompson filed an Aviation Safety Action Program ("ASAP")

report with the Airline. The ASAP program—a joint agreement between the Airline, the FAA, and the Union—immunizes crew members who report safety incidents against disciplinary action and discharge, based on the events they report, other than for intentional behavior that places the aircraft at risk. The terms of the ASAP program make clear that it is the employee's responsibility to file a safety report. *See* Herron Decl., Ex. 1, Sec. 11(1) ("The employee must submit the report in accordance with the time limits specified.").

Thompson's ASAP report detailed his experience during takeoff and recorded the two EICAS warning messages. Thompson made no mention of external conditions that necessitated unusual takeoff maneuvers. In summing up, he reported:

> That is the best I can recall of that very fast abnormal takeoff. After calling Gear UP, SOPs were not performed and I did not know what the PF was doing. Essentially, I felt like a passenger. I could never have predicted the actions that took place in those first 20-30 seconds of flight.

Thompson ASAP Report, Gleason Decl., Ex. R, at 3.

The ASAP reporting program has different time limits for different types of reports. An Event Review Committee ("ERC") may designate a report as "sole-source" if it is one where "all evidence of the event available to the FAA is discovered by or otherwise predicated on the report." ASAP Program Mem. of Understanding, Herron Decl., Ex. 1, § 11.c. There is no time limit for sole-source reports, and "[i]t is possible to have more than one sole-source report for the same event" under the program's terms. *Id.*

Meanwhile, non-sole-source reports must be made within 24 hours of the end of the flight where a safety incident occurred, or within 24 hours of becoming aware of possible non-compliance with federal safety regulations. *See id.* at 11.b.(1)-(2). In the latter situation, for disciplinary immunity to apply, the ERC must determine that the crew member "did not know or could not have known about the possible noncompliance." *Id.*

Unlike Thompson, Ustad did not file an ASAP report. He also did not enter the flight irregularities in the maintenance log of the airplane at the end of the flight, although he was required to do so under the Airline's procedures. Instead, Ustad filed a separate report under

3

a different voluntary disclosure program administered by the National Aeronautics and Space Administration ("NASA").

The NASA Aviation Safety Reporting Program, like ASAP, offers disciplinary immunity for reporting safety violations that are not deliberate.[2]  *See* Dep't. of Transp. FAA Advisory Circular 00-46D, 2, (discussing requirements for immunity under the NASA program). But unlike the ASAP program, the NASA program is not an agreement that involves the Airline; rather, its immunity protects against FAA actions (e.g., matters such as the agency's decision to "amend, modify, suspend, or revoke" a flight certificate, Gleason Decl., Ex. M.). Another difference is that the NASA program has a 10-day reporting limit in contrast to the ASAP program's 24-hour limit.

Ustad made his NASA report the day after the flight, on December 22, 2008, several hours after the ASAP 24-hour window had closed.  Earlier that day he had received phone calls from the Airline and the Union.  During the call from the Airline, Ustad was notified that there were reports of an event related to an aircraft he piloted, and that he would be placed on leave, with pay, while the Airline investigated the flight sequence.  Ustad also spoke with Gene Sowell ("Sowell"), the Union general counsel, about the incident.

In his NASA report, Ustad noted that "the aircraft accelerated very quickly and therefore the speed might have been exceeded," and that "the EICAS display later on indicated a 'Status' message, and it mentioned something cryptic about both flaps and gear." Herron Decl., Ex. 5, at 2.  Ustad also acknowledged, "I should have recorded in the Log those two Status messages, upon arrival at JFK, but instead told the maintenance crew entering the aircraft at JFK about them, and they indicated it was no problem." *Id.*

**2. Termination and Subsequent Proceedings**

On January 26, 2009, Ustad participated in an Investigatory Meeting, held by the

---

[2]Advisory Circular ("AC") 00-46D was replaced in 2011 by AC 00-46E, which made minor updates (e.g., making current the mailing address for reports).  AC 00-46D was in effect when Ustad made his report in 2008.

4

Airline, which was summarized in a letter two days later. *See* Herron Decl., Ex. J. The letter explained that data collected from the flight recording system (the AFIRS data) showed non-standard flap retraction, excessive speed, and the EICAS messages. *See id.* At the meeting, Ustad acknowledged the excessive speed and his failure to make entries in the maintenance log. *See id.* The Airline terminated Ustad's employment on February 2, 2009, finding that he acted "willfully contrary to the best interest of safety, and did in fact violate several" company policies and procedures. *See* Gleason Decl., Ex. K.

After Ustad's termination, the Union followed the procedures afforded to discharged pilots under the collective bargaining agreement ("CBA"). First, the Union unsuccessfully appealed to an Airline hearing officer. Then the Union timely initiated an arbitration before the Airline's System Board of Adjustment (the "Board"). *See* Herbst Decl., Ex. 14, at 22-25. The Union assigned Patrick Flynn ("Flynn") as the attorney to represent Ustad in the forthcoming arbitration proceedings. Flynn had over 15 years of prior experience handling grievance arbitrations and FAA matters. The Union also assigned two representatives, John Herron ("Herron") and Duncan Parsons ("Parsons") to assist Flynn.

In early May, Flynn received a copy of a report from the FAA (the "FAA Notice"). The FAA had instituted a separate investigation, and as part of those proceedings, the FAA had performed an AFIRS data analysis, which it used to determine that Ustad had violated Federal Aviation Regulations in ways similar to Ustad's earlier admissions (i.e., excessive speed and failing to make maintenance log entries). *See* Gleason Decl. Ex. M ¶¶ 5-7, 13-14. The FAA Notice concluded that Ustad had operated the aircraft in a "careless and reckless manner." *Id.* ¶ 15.

After receiving the report, Flynn "talked to the FAA lawyer about the [AFIRS] data" and sent it to Ustad shortly after receiving it. Gleason Decl., Ex. B, at 54. He also spoke to Herron about the AFIRS data. *Id.* at 83, 85-97. As Flynn explained, ". . . it was our conclusion that, first of all, the data was not admissible." *Id.* at 92. "And second, if it was admitted, it couldn't be used to terminate Captain Ustad. And third, it was kind of [] a mixed bag. And

5

fourth, we weren't 100 percent sure at that time that the data was even reliable." *Id.* He

concluded that, "based on all those factors, we didn't feel the need to seek out any expert or

even attempt to use the data in the arbitration." *Id.* at 93.

At the arbitration hearing, which took place on August 26-27, 2009, Ustad testified as

follows:

> Q:   You are familiar with the ASAP program and its property, aren't you?
> A:   I am.
>
> Q:   You were involved in negotiating, weren't you?
> A:   I was.
>
> Q:   And there is a provision in the ASAP report that the ERC – you know what the ERC is, don't you?
> A:   I do.
>
> Q:   —if they get a report from one pilot that implicates another pilot, they have the opportunity to give the second pilot some additional time to file an ASAP report; correct?
> A:   That's correct.
>
> Q:   You do know all of this?
> A:   I do know now, and I did then, yes.
>
> . . .
>
> Q:   Sir, the reason you didn't file an ASAP report is for the reason I outlined in my opening statement: You understood, sir, did you not, that you only have immunity under an ASAP report if it's accepted by the ERC; you understood that, didn't you?
> A:   That's correct.

Herron Decl., Ex. 2, 316-17. Ustad also testified that in addition to receiving the FAA Notice,

he received the actual AFIRS data "a couple of weeks" before the arbitration. *Id.* at 310.

At the hearing, Flynn argued unsuccessfully that admitting the AFIRS data violated

the CBA. Following the hearing, the parties submitted post-hearing briefs. *See* Herron Decl.,

Ex. 14 and 15. In the Union's brief, Flynn argued again that the AFIRS data should be

excluded, that any irregularities in the takeoff were a result of Ustad having to perform an

especially challenging sequence, and that NAA was "Out to Get Captain Ustad." *Id.* Ex. 14.

Flynn also argued that, in any event, termination was too extreme in comparison to other

cases of pilot misconduct.

The Board's decision, issued on March 2, 2010, upheld the Airline's termination.  *See* Herron Decl., Ex. 16.  It found that the Airline had just cause, credited Thompson, and provided extensive reasoning that analyzed and rejected Flynn's arguments.  *See id.*  A year later, in March 2011, the FAA issued a final report which concluded that Ustad operated the aircraft at an excessive speed in violation of Federal Aviation Regulations, but because it was unintentional his license would not be suspended.  Gleason Decl., Ex. O.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

A duty of fair representation claim is a hybrid claim, where a plaintiff must show "both(1) that [NAA] breached its collective bargaining agreement and (2) that [the Union] breached its duty of fair representation." *Sanozky v. Int'l Ass'n of Machinists & Aerospace Workers*, 415 F.3d 279, 282 (2d Cir. 2005).  "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190 (1967).

**1. Flynn's Representation**

Ustad argues that Flynn's representation both before and during the arbitration proceedings was so inadequate that it constituted a breach of the duty of fair representation. Ustad contends that Flynn (1) ignored or inadequately investigated the AFIRS data, and (2) breached the duty of fair representation by making a decision to focus instead on excluding

the data entirely from the arbitration proceeding. While it is understandable that Ustad is frustrated that the Airline's determination that he acted intentionally was contradicted—two years later—by the final FAA report, the record does not show that the Union failed to represent him fairly.

First, there is no evidence that Flynn ignored or inadequately investigated the AFIRS data. Flynn received the FAA report and the agency's analysis of the data. *See* Gleason Decl., Ex. L. He considered the FAA's analytic conclusions, spoke to an FAA lawyer about the data, conferred with Herron, and made a decision not to call witnesses to challenge the data and instead to argue against its admission. It was a decision based on multiple factors, including his belief that the data was "a mixed bag." *Id.* Ex. B, at 92. Thus, the record belies Ustad's bald assertion that "[Flynn's] conclusion was irrational, unreasonable and arbitrary." Pl.'s 56.1 Stmt. ¶¶ 172-73. It is true that Flynn relied, in part, on the 2009 FAA report, which was eventually revised by the 2011 report that cleared Ustad of acting intentionally. But Flynn cannot be expected to have factored future reports into his decision process in the summer of 2009.

Nor on this record was Flynn's decision not to search for more evidence to undermine the AFIRS data "so egregious, so far short of minimum standards of fairness to the employee and [] so unrelated to legitimate union interests as to be arbitrary." *NLRB v. Local 282, et al.*, 740 F.2d 141, 147 (2d Cir. 1984). Instead, Ustad's criticism of Flynn's investigation amounts to "[a]llegations of mere negligent or unsuccessful representation," which cannot survive a motion for summary judgment. *Diem v. Central Suffolk Hosp.*, 234 F.3d 1261 (2d Cir. 2000) (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-373 (1990)).

Plaintiff's reliance on *Webb v. ABF Freight System*, 155 F.3d 1230 (10th Cir. 1998), is inapt. In *Webb*, the Union representative failed to review any evidence before the arbitration hearing, which the Tenth Circuit found to be a clear breach of the duty of fair representation. As mentioned, Flynn had the AFIRS data, reviewed its analysis, and spoke with various Union representatives before he made a strategic choice to focus on excluding, rather than

drawing attention to, what he believed was harmful and inadmissible evidence.

Such judgments are properly viewed as tactical. *See, e.g., Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43-44 (2d Cir. 1989) There, the Second Circuit explained that, "[a] union's good faith, non-arbitrary failure to take an action that is unlikely to be advantageous does not subject it to liability for breach of its duty of fair representation." *Id.* at 44. Its reasoning is apt here:

> Barr argues that Local 804 acted arbitrarily and in bad faith when it refused to present Barr's witnesses . . . and by failing both to prepare adequately for the meetings and the arbitration hearing and to have Pritchard represent Barr from the outset. While these decisions might conceivably have affected the outcome of the arbitration, they indubitably do not rise to the level of bad faith and arbitrariness. In hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous. The decisions taken here by Local 804 were tactical in nature. At most, they may have been errors of judgment. In any event, they were not so egregious as to be evidence of bad faith and failure fairly to represent Barr.

*Id.* at 43. Ustad's arguments are similar, including his claim that Flynn's choice to pursue the data exclusion strategy led to a failure to call expert witnesses. Even if Ustad had called witnesses, it is only hypothetical speculation that the arbitration Board would have discredited the AFIRS data.

Finally, there is no genuine dispute about what the AFIRS evidence revealed or that the Board found that it was highly corroborative of Thompson's testimony. While Ustad offers a different *explanation* from that of Thompson about what led to the excessive speed, aircraft nose dips, and unusual wing flap behavior, he does not dispute the evidence itself.[3] Although his characterization of the nose dips was that they were not irregular, that is beside the point. The Board was well within its discretion to credit Thompson as it viewed the

---

[3]Plaintiff asserted both in his opposition memorandum and at oral argument that the flight data showed irregular activity because Ustad had to perform a difficult low-altitude level-off ("LALO") takeoff procedure that he "had never performed before, and on which all NAA pilots lacked training." Pl.'s Mem. Opp. S.J. But the record directly contradicts those representations: Ustad testified on direct examination at the arbitration hearing that he had been trained on the procedure in 2000 on a Boeing simulator, and that he had performed the procedure twice—and one of those times at Pope Air Force base, where the current incident occurred. *See* Herron Decl., Ex. 18.

**SPA-11**

AFIRS data as one part of the evidence as a whole.

Even viewing the facts in the light most favorable to Ustad, the party opposing summary judgment, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the Court concludes that Ustad has failed to show that any of Flynn's representation amounted to conduct that was "so egregious, so far short of minimum standards of fairness to the employee and [] so unrelated to legitimate union interests as to be arbitrary." *NLRB*, 740 F.2d at 147.  Neither does the evidence support that Flynn's conduct  was "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190.

**2. Ustad's Failure to File an ASAP Report**

Because Ustad was represented fairly throughout the arbitration proceeding, the Board's decision must stand, as well as its affirmation of the Airline's finding that Ustad acted "willfully contrary to the best interest of safety, and did in fact violate several" company policies and procedures. *See* Gleason Decl., Ex. K.  This renders the issue of the ASAP Report irrelevant, because reporting intentional conduct provides no immunity.

Nevertheless, the Court will briefly address Ustad's claim that the Union breached its duty to represent him fairly by failing to advise him to make an ASAP report within 24 hours.  The parties dispute what advice, if any, the Union gave to Ustad about filing an ASAP report and the circumstances of his failure to file one.  However, the entire dispute is immaterial because, even if he had been found to have acted unintentionally, (1) Ustad was aware of the ASAP reporting requirements, (2) he was aware that a reportable incident had occurred, and (3) his first contact with the Union occurred after the 24-hour reporting period.

First, the record establishes that Ustad must have known of the ASAP policy, which makes it the responsibility of the employee to file a report.  Ustad testified that he was familiar with the ASAP program, was involved in negotiating it, was familiar with the role of the ERC, and was knowledgeable about its timing requirements at a level of detail where he knew that the ERC could give a pilot additional time to file an ASAP report when another pilot had filed a report implicating him.  *See* Herron Decl., Ex. 2, 316-17.  Moreover, Ustad

was not minimally involved in negotiations.  He spent four years as chair of the Union's negotiating committee for a period ending May 2008—only seven months before the event.

Ustad also was aware that a reportable incident had occurred.  He asserts that, without the details of Thompson's ASAP report, he could not respond with his own, but there is no dispute that he piloted the flight at a speed that exceeded Federal Aviation Regulations—a fact confirmed even by the final 2011 FAA report.  Ustad also acknowledged in his NASA report that, "I should have recorded in the Log those two Status messages," *id.* Ex. 5, 2, which was an admission of both his failure to make a required log entry and the existence of the EICAS warnings.  All of these were reportable safety incidents that Ustad knew about the moment he landed at JFK.

Finally, there is no dispute that Ustad's first contact with the Union was more than 24 hours after the end of the flight; consequently, the Union could not have impacted his ability to make a report during the initial 24-hour window.

## CONCLUSION

For the reasons stated above, the Court granted the Union defendants' motion for summary judgment.

 /s/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
April 1, 2014

11