# 14-1128

# United States Court of Appeals

*for the*

# Second Circuit

---

OLA USTAD,

*Plaintiff-Appellant,*

— v. —

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 747,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, NORTH
AMERICAN AIRLINES, GLOBAL AVIATION HOLDINGS, INC.,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 747 AND INTERNATIONAL BROTHERHOOD OF TEAMSTERS

FRANKLIN K. MOSS
SPIVAK LIPTON LLP
*Attorneys for Defendants-Appellees
International Brotherhood of
Teamsters, Local 747 and
International Brotherhood of
Teamsters*
1700 Broadway, 21st Floor
New York, New York 10019
(212) 765-2100

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF ISSUE ........................................................................ 2

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF ARGUMENT ............................................................... 18

ARGUMENT ......................................................................................... 20

A.    Summary Judgment Standard of Review ...................................... 20

B.    Legal Principles Relating to Claims of Breach of
the Duty of Fair Representation ..................................................... 21

C.    The District Court Properly Granted Summary
Judgment in Favor of the Union .................................................... 24

       1.  Plaintiff/Appellant Is Not the Victim of a Company-Union
Plot to Fire Him and Prevent Him from Getting His Job Back .............. 24

       2.  The Union Did Not Violate its Duty of Fair Representation by
Mishandling Plaintiff/Appellant's Grievance/Arbitration ...................... 25

D.    The District Court Properly Rejected Plaintiff/Appellant's Claim that the
Union Violated the Duty of Fair Representation Regarding
Plaintiff/Appellant's Failure to File an ASAP Report ................................... 33

CONCLUSION ...................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**      **Page**

*Air Line Pilots Ass'n v. O'Neill,*
499 U.S. 65, 111 S. Ct. 1127, 113 L.Ed.2d 51 (1991) ..............................21, 22, 24

*Barr v. United Parcel Serv., Inc.,*
868 F.2d 36 (2d Cir. 1989) ............................................................... 22, 23-24, 25

*Bhd. of Locomotive Firemen & Enginemen v. United Transp. Union,*
471 F.2d 8 (6th Cir. 1972) ......................................................................................2

*Cook v. Pan Am. World Airways, Inc.,*
771 F.2d 635 (2nd Cir. 1985) ...............................................................................24

*Fechtelkotter v. Air Line Pilots Ass'n., Int'l,*
693 F.2d 899 (9th Cir. 1982) ..................................................................................1

*Hines v. Anchor Motor Freight, Inc.,*
424 U.S. 554, 96 S. Ct. 1048, 47 L. Ed.2d 231 (1976) ........................................34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed.2d 538 (1986) ......................................21

*Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.,*
2005 WL 1661093 (E.D.N.Y. July 14, 2005);
*aff'd* 204 Fed. Appx. 40 (2nd Cir. 2006) ...........................................................21

*Raus v. Bhd. of Railway Carmen,*
663 F.2d 791 (8th Cir. 1981) ............................................................................ 1-2

*Spellacy v. Airline Pilots Ass'n-Int'l,*
156 F.3d 120 (2d Cir.1998) .............................................................................21, 24

*Steele v. Louisville & Nashville Rail Road Co.,*
323 U.S. 192, 65 S. Ct. 226, 89 L. Ed. 173 (1944) ...............................................2

*Tenenbaum v. Williams*,
   193 F.3d 581 (2d Cir. 1999)................................................................20

*United Steelworkers v. Rawson*,
   495 U.S. 362, 110 S. Ct. 1904, 109 L. Ed.2d 362 (1990)...................23

*Vaca v. Sipes*,
   386 U.S. 171, 87 S. Ct. 903, 17 L. Ed.2d 842 (1967).......................23

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
   604 F.3d 703 (2nd Cir. 2010) .......................................................22, 24

*Wood v. Int'l Bhd. of Teamsters, Local 406*,
   807 F.2d 493 (6th Cir. 1986)...............................................................34

*White v. White Rose Food, Div. of DiGiorgio Corp.*,
   237 F.3d 174 (2d Cir. 2001)................................................................21

**Statutes**

28 U.S.C. § 1291 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................2

*Labor Management Relations Act,*

   29 U.S.C. § 185 ...................................................................................1

*Labor Management Reporting and Disclosure Act,*

   29 U.S.C. § 412 .........................................................................1 & n.1

*Railway Labor Act,*

   45 U.S.C. § 151 ...................................................................................1

**Federal Rules**

Fed. R. Civ. P. 56(a)......................................................................... 20-21

Appellees International Brotherhood of Teamsters ("IBT"), by its Airline Division, and Teamsters Local 747 ("Local 747"), defendants below (collectively, "Appellees," or "Union"), submit their brief in response to the appeal by Appellant Ola Ustad, plaintiff below ("Plaintiff/Appellant" or "Ustad"), of the Memorandum and Order of the United States District Court for the Eastern District of New York (Block, J.) granting summary judgment in favor of the Union, entered on March 31 and April 1, 2014.

## JURISDICTIONAL STATEMENT

Plaintiff/Appellant mistakenly asserts that his claims below arise under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and that the district court had jurisdiction to adjudicate his claims pursuant to 29 U.S.C. § 412.[1] Plaintiff/Appellant's employment relationship with defendant North American Airlines, Inc. ("NAA") was governed not by the LMRA, but by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq*. The district court, therefore, did not have jurisdiction to adjudicate Appellant's claims pursuant to the LMRA. *See Fechtelkotter v. Air Line Pilots Ass'n, Int'l*, 693 F.2d 899, 902-03 (9th Cir. 1982); *Raus v. Bhd. of Ry. Carmen*, 663 F.2d 791, 794 (8th

---

[1] Plaintiff/Appellant did not actually make any claims under the Labor-Management Reporting and Disclosure Act ("LMRDA"), and thus his citation of 29 U.S.C. Section 412, which permits civil actions under the LMRDA, may properly be disregarded as a basis for jurisdiction.

Cir. 1981); *Bhd. of Locomotive Firemen & Enginemen v. United Transp. Union*, 471 F.2d 8, 9 (6th Cir. 1972).

Plaintiff/Appellant alleges that the Union breached its duty of representation. The Supreme Court established the duty of fair representation in *Steele v. Louisville & Nashville Rail Road Co.*, 323 U.S. 192, 65 S. Ct. 226, 89 L. Ed. 173 (1944), by inferring that such a duty was implied in the RLA by virtue of that statue's grant of exclusive bargaining responsibility to employees' representatives. The Court later extended the duty of fair representation to employees covered by the National Labor Relations Act, as amended by the LMRA. Here, because Plaintiff/Appellant's employment relationship was governed by the RLA, the district court exercised jurisdiction over Appellant's claims pursuant to the RLA and 28 U.S.C. Section 1331. This Court has jurisdiction over Plaintiff/Appellant's appeal pursuant to 28 U.S.C. Section 1291 because this appeal is from a final decision dismissing all of Plaintiff/Appellant's claims.

## STATEMENT OF ISSUE

Whether the district court correctly granted summary judgment in favor of the Union on all of Plaintiff/Appellant's claims because Plaintiff/Appellant's claims do not give rise to a breach of the duty of fair representation.

## STATEMENT OF THE CASE

As required by the RLA and the National Mediation Board's rules, the IBT, through its Airline Division, holds the certifications and exclusive bargaining rights with respect to its airline members. (JA[2] 58, ¶ 1.) In turn, the IBT assigns its airline bargaining and representation responsibilities to various local unions affiliated with it. (*Id.*) From the time IBT began representing NAA pilots until April 2009, when IBT put Local 747 into trusteeship, Gene Sowell was the president and general counsel of Local 747. (JA 59, ¶¶ 3, 5; JA 131, 136, 150, 154.) Thereafter, Sowell was charged by the Independent Review Board with embezzlement in connection with his stewardship over Local 747. (JA 131.)

At all relevant times, Plaintiff/Appellant worked for NAA. (JA 60, ¶ 8.) NAA was an air carrier that is now defunct. *See* Case No. 13-12945-MFW (Bankr. Del.) Along with its sister corporations and holding company parent, NAA ceased operations and is now in liquidation under the jurisdiction of the United States Bankruptcy Court for the District of Delaware. *Id.*

Plaintiff/Appellant is a very experienced airline pilot. (JA 60, ¶ 8.) He was also a member of Local 747, and served as an official on the Local 747 executive board. (*Id.*, ¶ 10.) Until shortly before his discharge, Plaintiff/Appellant had served as chairman of the Local 747 NAA negotiating committee, and, for more than two

---

[2] Citations to the Joint Appendix will appear in the format "JA __."

years, he had also been a part of the Local 747 professional standards committee. (JA 60-61, ¶¶ 9, 11.)

In June 2008, the IBT-represented NAA pilots ratified their first collective bargaining agreement ("CBA"). (JA 59, ¶¶ 6, 7.) The CBA provided, among other things, that information obtained from a flight safety monitoring device, including automatic flight information recording systems ("AFIRS"), "shall not constitute the basis for any disciplinary action." (JA 62, ¶ 19; JA 1754 ¶ G.) The CBA further provided for the final and binding settlement of disputes by means of a three-person arbitration panel, known as a "System Board of Adjustment." (JA 61, ¶ 16; JA 1684, ¶ D.)

In August 2008, Local 747 signed a Memorandum of Understanding ("MOU") with NAA implementing a federal safety program, known as the Aviation Safety Action Program ("ASAP"). (JA 63, ¶ 24.) The Federal Aviation Administration ("FAA") signed and entered into the MOU in October 2008. (*Id.*) Plaintiff/Appellant was Local 747's negotiating committee chairman when Local 747, NAA, and the FAA were negotiating the ASAP MOU. (JA 18, ¶ 6; JA 63, ¶ 25.) The ASAP program, as embodied in the MOU, encourages pilots voluntarily to self-disclose safety-related concerns to their employers, including events that involve or may involve violations of federal aviation regulations. (JA 64, ¶ 28.)

The NAA ASAP MOU granted disciplinary immunity to NAA pilots who

filed written reports that were accepted by an Event Review Committee ("ERC"), made up of representatives from the NAA, the Union, and the FAA. (JA 63, ¶ 23; JA65, ¶ 31.) Such disciplinary immunity, however, did not extend to pilots in circumstances where they self-reported an event that "is not inadvertent or that appears to involve an intentional disregard for safety, criminal activity, substance abuse, controlled substances, alcohol, or intentional falsification." (JA 329.) ASAP reports that were not "sole source," meaning there was other evidence of the event, had to be submitted within twenty-four (24) hours of the end of the flight sequence for the day of the occurrence, absent extraordinary circumstances, or within twenty-four (24) hours of the crewmember's knowledge of an issue involving possible regulatory violations, to qualify for disciplinary immunity. (JA 66, ¶ 35.) ASAP reports that were sole source had no timeliness requirement. (*Id.*) If the ERC determined that a pilot did not know or could not have known about a possible regulatory violation, it provided an opportunity for the pilot to submit an ASAP report within 24 hours of notification. (*Id.*)

NAA discharged Plaintiff/Appellant on February 2, 2009 based on his performance as pilot-in-command involving his operation of a wide-body B-767 airplane on December 21, 2008. (JA 61, ¶ 13.) Early that morning of December 21, 2008, Plaintiff/Appellant piloted Flight 986, from Pope Air Force Base to John F. Kennedy Airport ("JFK"), with bargaining unit employee Rye Thompson serving

as the co-pilot and first officer ("F/O Thompson"). (JA 67, ¶ 45.) During the critical takeoff phase of the flight, Plaintiff/Appellant exceeded certain regulatory speed limits. (JA 1999, 2001.) Additionally, during the flight two maintenance system alert messages appeared on the aircraft's secondary monitoring system concerning wing flaps and slats. (JA 69, ¶ 60; JA 85, ¶ 162.) Upon their arrival at the landing gate at JFK, F/O Thompson told Plaintiff/Appellant that he felt uncomfortable about the takeoff and that he did not know what he would say if someone asked him about it. (JA 71, ¶ 71.) F/O Thompson testified at the arbitration hearing involving Plaintiff/Appellant's discharge that he said to Plaintiff/Appellant, "Ola, in my two and a half years at this company that's the most uncomfortable I have been in an aircraft. That's the most unsafe thing I have been a part of, and I don't know how I'm going to handle this." (JA 70, ¶ 62.) The two pilots specifically discussed F/O Thompson's concern about the maintenance alert messages. (JA 71, ¶ 71.) Nonetheless, Plaintiff/Appellant did not make required entries in the aircraft maintenance log concerning those maintenance alerts. (*Id.*, ¶ 70.)

Later that day, F/O Thompson contacted NAA management and reported his concerns about the takeoff and the airworthiness of the aircraft. (JA 68, ¶ 49.) F/O Thompson alleged specific, non-standard takeoff maneuvers made by Plaintiff/Appellant that he believed potentially stressed the airframe structure. (JA

68-70, ¶¶ 51-61.)  F/O Thompson also filed an ASAP report.  (JA 68, ¶ 48.)

Plaintiff/Appellant did not file an ASAP report regarding Flight 986.  (JA

71, ¶ 72.)  He claims that he learned of F/O Thompson's report more than 24 hours

after the flight from Local 747's then president and general counsel, Gene Sowell.

(JA 72, ¶¶ 76-77; JA 73, ¶ 80.)  Plaintiff/Appellant claims that Sowell advised him

not to file such a report because it was "too late" and that he should wait for an

invitation from the ERC.  (JA 73, ¶ 83; JA 787.)

NAA advised Plaintiff/Appellant that he was under investigation on

afternoon of December 22, 2008.  (JA 790.)  At that time, NAA asked

Plaintiff/Appellant to complete an incident report.  (*Id.*)  Plaintiff/Appellant did not

comply.  (JA 791.)

After speaking with NAA management, Plaintiff/Appellant received a call

from Captain Phillip Kemp, a Local 747 representative and member of the ERC.

(*Id.*)  Kemp suggested that Plaintiff/Appellant file an ASAP report.  (*Id.*)

Plaintiff/Appellant chose not to do so.  (*Id.*)

Rather than file an ASAP report, on December 22, 2008, Plaintiff/Appellant

attempted to avail himself of the immunity protections afforded to pilots under

another federal aviation voluntary self-disclosure program administered by the

National Aeronautics and Space Administration ("NASA").  (JA 493-95.)  Like

ASAP reports, pilots may voluntarily report non-intentional violations of federal

safety regulations to NASA in an effort to immunize themselves from regulatory actions against their licenses. (JA 67, ¶¶ 42-44.) Such reports are confidential and are not shared with the carrier. (*Id.*, ¶ 43.) In filing the NASA report, Plaintiff/Appellant disclosed that in piloting Flight 986, he may have exceeded the aircraft's speed limitations and noted that he had not made any log entries regarding mechanical alarms that had been triggered during the flight. (JA 76-77, ¶¶ 108-09.) Plaintiff/Appellant attributed the potential speed violation to the early hour of the day, his lack of rest, and the requirements of the takeoff. (JA 494.) Notably, he did not mention his claim made for the first time at arbitration that F/O Thompson failed to respond to commands. (*Id.*)

On January 2, 2009, the ASAP coordinator and ERC administrator, Lori Weller, called Plaintiff/Appellant but Plaintiff/Appellant did not answer her call. (JA 77, ¶ 113; JA 868, ¶ 113.) She therefore left him a message putting him on notice that an ASAP report had been filed concerning Flight 986 and advising him to consider filing an ASAP report himself. (*Id.*) After retrieving her message, and despite now having at least twice been advised and put on notice that his Flight 986 was the subject of an ASAP event, and having twice been encouraged to file an ASAP report of his own concerning that flight, Plaintiff/Appellant chose not to file an ASAP report. (JA 868-69, ¶ 113.) Indeed, he did not even return Weller's call. (*Id.*) Plaintiff/Appellant instead decided to take a "wait-and-see" approach, such

that he would wait to file an ASAP report only if, after conducting a formal adjudicatory meeting concerning F/O Thompson's ASAP report, the ERC formally invited him to file one. (*See* JA 78, ¶¶ 118, 120.)

The ERC considered F/O Thompson's ASAP report, on January 15, 2009, and it accepted it. (JA 74, ¶ 93.) It did not offer Plaintiff/Appellant another opportunity to file his own ASAP report. (*Id.*)

NAA subsequently conducted an in-person investigatory hearing on January 26, 2009 regarding Plaintiff/Appellant's performance involving Flight 986. (JA 79, ¶ 125.) The Company memorialized the meeting in a January 28, 2009 letter addressed to Appellant. (JA 80, ¶ 131.) In that letter, NAA recounted Plaintiff/Appellant's then version of events and reiterated its request for a written report from him. (*Id.*, ¶ 132.) NAA's letter includes no reference to Plaintiff/Appellant's claim that F/O Thompson was not responsive during take-off. (*Id.*, ¶¶ 130, 132.)

In a letter dated February 2, 2009, NAA informed Plaintiff/Appellant that, after completing its investigation, it had decided to fire him because his "intentional disregard of prescribed flight profiles and Standard Operating Procedures constitutes a breach of trust that threatens not only the safety of yourself, the aircraft, your fellow crewmembers, but also the future viability of the Company." (JA 81, ¶¶ 134, 136.)

Also on February 2, 2009, the Union timely filed a grievance on Plaintiff/Appellant's behalf. (*Id.*, ¶ 137.) At the February 13, 2009 grievance hearing, attended by several Local 747 representatives, including Sowell, Plaintiff/Appellant admitted that he had made mistakes with respect to his piloting of Flight 986. (JA 82, ¶ 142.) Sowell objected to the company's reliance on AFIRS data, arguing that such use was prohibited by the CBA. (*Id.*, ¶ 141.)

In a February 27, 2009 letter, NAA denied the grievance. (*Id.*, ¶ 143.) On March 2, 2009, Local 747 timely advanced the grievance to the System Board of Adjustment, seeking resolution through final and binding arbitration. (*Id.*, ¶ 144.)

In April, 2009, Sowell assigned the grievance/arbitration to Local 747's regular outside counsel, Patrick Flynn. (JA 84, ¶ 153.) Flynn is a union-side labor lawyer with approximately thirty years of experience, and is well versed in airline labor relations. (*Id.*) Flynn and Plaintiff/Appellant prepared for the arbitration *via* email and telephone during the period prior to the System Board arbitration hearing. (JA 85, ¶ 158.)

In preparation for the arbitration, Flynn worked with two Union representatives, including John Herron, a former Navy pilot and law school graduate who is also an experienced commercial pilot and is type-rated in the Boeing 767 aircraft, *i.e.*, the same type of aircraft flown by Appellant during Flight 986. (JA 84, ¶ 155.) The second representative, Duncan Parsons, was an NAA

pilot and member of the Local 747 professional standards committee. (*Id.*)

Plaintiff/Appellant also asked that Flynn work with Appellant's wife, who is a

former pilot and flight instructor. (JA 84, ¶ 156.)

During the course of his preparation for the arbitration, Flynn reviewed

various documents, including Plaintiff/Appellant's NASA report, the AFIRS data,

a summary report prepared by the FAA regarding Plaintiff/Appellant's piloting of

Flight 986, and documents that Herron had obtained from the Boeing Company

relating to low altitude takeoff procedures for B-767 aircraft, as well as NAA

training documents. (JA 85, ¶¶ 161-162.) Flynn, Plaintiff/Appellant, and

Plaintiff/Appellant's wife exchanged multiple emails. (JA 85, ¶¶ 158, 160; JA 90-

91, ¶ 194.) Flynn, Herron, Parsons, Plaintiff/Appellant, and his wife also met in

New York City the day prior to the commencement of the hearing and prepared in

person. (JA 88, ¶ 175.)

Also during his preparation for the arbitration, Flynn discussed the AFIRS

data with Herron. (JA 86, ¶ 165.) Flynn concluded that it was a "mixed bag." (JA

87, ¶ 172.) He concluded that it mostly supported F/O Thomas's account, though

not completely. (*Id.*) In reaching this conclusion, Flynn took into account

Herron's observations that portions of the AFIRS data showed that the plane had

not been flown in conformance with standard operating procedure, including

premature flap retraction, inconsistent pitch angles, and excessive speed. (JA 87-

88, ¶¶ 169, 170, 172.)  Flynn did not consider hiring an expert to refute the data

because Appellant had admitted that the plane "got ahead of him" to NAA

management and in his NASA report.  (JA 88, ¶ 174.)  Flynn did not believe he

could find an expert to say the data was unreliable.  (JA 87, ¶ 172.)  His planned

strategy was to object to the admission of or reliance on the data and if admitted,

challenge its reliability.  (*Id.*, ¶¶ 171-172.)

The System Board arbitration commenced on August 26, 2009.  (JA 89, ¶

184.)  Flynn, his two assistants, and Plaintiff/Appellant appeared on behalf of the

Union.  (*Id.*, ¶ 185.)  Arbitrator James E. Conway, Esquire, served as the neutral

member and chairman of the System Board.  (*Id.*, ¶ 186.)  Each side was afforded

ample opportunity to cross examine witnesses, present documentary evidence and

to object to each other's evidence.  (JA 89-90, ¶¶ 187-88.)

NAA supported its case through the testimony of several witnesses,

including F/O Thompson.  (JA 90, ¶ 189.)  It also sought to corroborate F/O

Thompson's account of Flight 986 using the AFIRS data.  (*Id.*, ¶ 190.)  Flynn

strenuously sought to exclude that evidence, arguing that the use of such data was

prohibited by the CBA.  (*Id.*, ¶ 191.)  Arbitrator Conway nevertheless conditionally

allowed the AFIRS data into evidence and directed the parties to further address

the issue in their post-hearing briefs.  (*Id.*)

At the conclusion of the hearing on August 27, 2009, Plaintiff/Appellant sent an email to Union representative Herron, writing, "[i]t was a pleasure being in your company this week and I again thank you for both your efforts and that of Patrick [Flynn]."  (JA 90, ¶ 193.)

Flynn shared a draft of his brief with Plaintiff/Appellant and Plaintiff/Appellant's wife before submitting the final draft.  (*Id*., ¶ 194.)  In a November 21, 2009 email to Herron, Plaintiff/Appellant's wife praised the effort, writing, "I have read the closing argument . . .  I have written Pat [Flynn], I think it's been a 100% effort on his and the IBT's part."  (*Id.*)  In a follow-up email dated November 24, 2009, Plaintiff/Appellant's wife informed Flynn that Plaintiff/Appellant had finished reading the brief and, like his wife, believed that the brief represented a "100% job on your part."  (*Id*.)  Flynn submitted the closing brief on December 11, 2009.  (JA 91, ¶ 195.)  As set forth in the 39-page brief, Flynn forcefully presented both facts and legal arguments in support of the grievance.  (*Id*., ¶ 196.)

On March 2, 2010, Arbitrator Conway issued a final and binding written decision denying the Union's grievance and upholding Plaintiff/Appellant's discharge.  (JA 91, ¶ 197.)  In his decision, Arbitrator Conway addressed and rejected each of the Union's' arguments in support of Appellant.  (JA 91-93, ¶¶ 198-202.)  Arbitrator Conway faulted Plaintiff/Appellant for not complying with

NAA's request for a written report. (JA 92, ¶ 201.) Arbitrator Conway did not

credit Plaintiff/Appellant's claims that F/O Thompson was not responsive to

commands in the cockpit. (*Id.*, ¶¶ 200-01.) In rejecting the Union's argument

questioning the experience and credibility of F/O Thompson, for example,

Arbitrator Conway wrote that, "the Board does not come away from a reading of

First Officer Thompson's written report or his examination and cross-examination

in this proceeding with the impression that he was either inexperienced or

inattentive as implied." (*Id.*, ¶ 200.) Moreover, in assessing the testimony of both

Plaintiff/Appellant and F/O Thompson, Arbitrator Conway further wrote that:

> In the Judgment of the Board, it is not that the otherwise credible
> assertions of a reluctant First Officer are undefeatable. But they are
> not defeated by a Grievant [Appellant] who, having had multiple fair
> chances to explain or contest the factual basis for discipline, justifies
> his flying in terms of a borderline incompetent co-pilot; denies any
> nose pushover in the face of competing recorded evidence, indicating
> simply that 'it came down a little bit' in response to trimming and re-
> trimming; has no explanation for declining to provide the written
> statement twice requested by the Company; professes to have never
> received the ASAP administrator's invitation to submit an ASAP
> report; never suggests during any of the three hearings provided prior
> to arbitration that he had received insufficient support in the cockpit
> from his First Officer; flatly denies events described by his First
> Officer with no accounting for what might motivate such fabrication;
> and after two weeks of studying AFIRS data that indicates among
> other irregularities a flap retraction at 80 feet insists that 'Your data,
> as far as I am concerned, is incorrect.' The Board concludes that
> notwithstanding a high level of advocacy on his behalf by his Union
> attorney, Grievant [Appellant] has not risen the occasion.

(*Id.*, ¶ 201.) Furthermore, Arbitrator Conway specifically rejected the Union's

argument that the NAA had improperly relied upon the AFIRS data as the basis for firing Plaintiff/Appellant.  (JA 93, ¶ 202.)

Flynn emailed a copy of Arbitrator Conway's decision to Plaintiff/Appellant on March 5, 2010.  (JA 93 ¶ 203.)  Plaintiff/Appellant responded to Flynn, thanking him for his service and efforts on his behalf.  (JA 94, ¶ 205.) Subsequently, in a March 28, 2010 email to Herron and Flynn, Plaintiff/Appellant's wife wrote that she and Plaintiff/Appellant were "sorely disheartened" by the decision, but noted that "we do not cast blame."  (*Id.*, ¶ 206; JA 805.)  She further noted that, "[a]s educated and fair as we believed this arbitrator to be he is still a human being and human beings make mistakes."  (JA 805.)  Acknowledging that "it's so simple to 'Monday morning quarterback,' Plaintiff/Appellant's wife further noted that "in hindsight I can see where we went wrong."  (JA 94, ¶ 206; JA 805.)  In her opinion, "had we been less complacent about AFIRS and had we had some witnesses present to testify to the ability and integrity of [Plaintiff/Appellant] we may have found ourselves with a different outcome."  (*Id.*)  Finally, Plaintiff/Appellant's wife wrote that she and Plaintiff/Appellant would seek to appeal the decision "not because we feel the IBT misrepresented us but because we believe the arbitrator, in all his wisdom, was inundated with technicalities and processes that he did not seem to understand and that were too much for two eyes and one brain to process[.]"  (*Id.*)

Meanwhile, in a separate proceeding that it had initiated in March 2009, the

FAA brought a regulatory action against Plaintiff/Appellant, seeking to suspend his

license on account of his operation of Flight 986 in violation of federal safety

regulations. (JA 83, ¶ 145.) At the license suspension hearing, the FAA

Administrator took the position that Plaintiff/Appellant's violation of federal

regulations was intentional and therefore his NASA report would not be accepted.

(JA 96, ¶ 208.) The administrative law judge ("ALJ") ruled in favor of the FAA

and suspended Plaintiff/Appellant's pilot's license. (JA 1637-47.) After an appeal

of the ALJ's decision, Plaintiff/Appellant reached a settlement with the FAA, as

reflected in an "Amended Order of Suspension," dated July 29, 2011. (JA 96, ¶

209.) The FAA's Amended Order of Suspension finds that Plaintiff/Appellant

"operated the aircraft at an indicated airspeed between 270 and 290 knots while the

aircraft was climbing from 2,000 feet MSL to 9,000 feet MSL" in violation of

Federal Aviation Regulation 91.117(a) which states that no person may operate an

aircraft below 10,000 feet MSL at an indicated airspeed of more than 250 knots.

(*Id.*, ¶ 210.)

Approximately six months after the arbitrator upheld his termination,

Plaintiff/Appellant commenced this action against NAA and the Union, alleging

that the Union breached its duty of fair representation because Flynn botched the

arbitration by failing adequately to investigate the AFIRS data. (JA 16-36.)

According to Plaintiff/Appellant, the AFIRS data contained "critical" and

"powerful exculpatory" evidence at the arbitration, and was not properly used in

that proceeding. (*Id.*) The parties engaged in extensive discovery and

Plaintiff/Appellant took numerous depositions of Union representatives and agents,

including attorney Flynn. (*See* JA i-ii, v-vi, ix (referencing discovery).) At the

conclusion of discovery, the Union filed a motion for summary judgment on all

counts. (*See* JA 55-843.)

The district court granted summary judgment to the Union and in so doing,

rejected all of Plaintiff/Appellant's arguments. (JA 1999-2005.) The court held

that Plaintiff/Appellant "failed to show that any of Flynn's representation

amounted to conduct that was 'so egregious, so far short of minimum standards of

fairness to the employee and [] so unrelated to legitimate union interests as to be

arbitrary.' Neither does the evidence support that Flynn's conduct was 'arbitrary,

discriminatory, or in bad faith.'" (JA 2004 (citations omitted).) The court also

rejected Plaintiff/Appellant's arguments that the Union breached its duty of fair

representation by not advising him within 24 hours of Flight 986 to file an ASAP

report in an effort to immunize himself from discipline. (*Id.*) First, the court held

that because Appellant's fair representation claim against the Union relating to

Flynn's conduct of the discharge arbitration lacked merit, the arbitrator's decision, including his conclusion that Plaintiff/Appellant had intentionally engaged in misconduct, must remain intact. (*Id.*) As a result, Plaintiff/Appellant could not have immunized himself through the ASAP program because his conduct was intentional. (*Id.*) The court further noted that even if Plaintiff/Appellant otherwise could have immunized himself from discipline under the ASAP program, his duty of fair representation claims against the Union still would fail because: (1) he was aware, or should have been aware, of the ASAP reporting requirements by virtue of his experience as a pilot and his own obligations under the ASAP program and in light of his own involvement in negotiating the ASAP MOU; (2) he was aware that a reportable incident had occurred within twenty-four hours of the flight by virtue of his discussion with F/O Thompson; and (3) because his first contact with the Union occurred after the 24-hour reporting period, he was not the victim of a plot to prevent him from filing an ASAP. (JA 2004-05.)

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment in favor of the Union and against Ustad, and its decision should be upheld. It is well settled that in order to succeed in a hybrid breach of duty of fair representation claim such as is raised in this case, a plaintiff must prove (1) the employer's breach of a collective

18

bargaining agreement and (2) the union's breach of its duty of fair representation *vis-a-vis* the union members.

Plaintiffs bear an enormous burden to sufficiently plead and prove a breach of the duty of fair representation. That is particularly the case where the plaintiff's claims relate to a union's loss of his or her grievance in a binding arbitration proceeding. Such claims often reflect mere second-guessing of the union's tactical decisions and actions in prosecuting the grievance, and such "Monday morning quarterbacking" does not state a viable claim for the breach of the duty of fair representation. Such is the case here, where Plaintiff/Appellant praised the Union's efforts in pursuing his discharge grievance through arbitration until shortly after he received the arbitrator's unfavorable decision. At that point, Plaintiff/Appellant's praise turned to blame for problems that were of his own making.

It bears noting that Plaintiff/Appellant was fired for having violated federal regulatory safety regulations. By foisting the blame for all that happened in the cockpit of Flight 986 upon F/O Thompson, Plaintiff/Appellant did not impress the arbitrator, and the arbitrator credited the testimony of F/O Thompson and the employer's witnesses over Plaintiff/Appellant's. Plaintiff/Appellant did not listen to the advice of ASAP/ERC and Union representatives who urged him to file an

ASAP report in an effort to avoid discipline. He now blames the Union for his failure to do so. He also blames the Union's lawyer who handed the arbitration proceeding for botching his case.

Thus, to the extent there is a common theme in this case, it is perhaps that Plaintiff/Appellant blames others for his own failings. Be that as it may, the essential ingredients needed to maintain a claim against a union for the breach of the duty of fair representation are lacking here. Specifically, as the district court properly held, Plaintiff/Appellant has failed to show that the Union acted arbitrarily, discriminatorily, or in bad faith in connection with his discharge arbitration and in connection with his failure to file an ASAP report before NAA commenced disciplinary proceedings against him. Accordingly, the Court should uphold the district court's judgment in this case.

## ARGUMENT

### A.    Summary Judgment Standard of Review

Because the district court granted summary judgment, this Court reviews that decision *de novo*, and construes the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R.

Civ. P. 56(a), *i.e.*, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986).

**B**.     **Legal Principles Relating to Claims of Breach of the Duty of Fair Representation**

A union "has a duty to represent fairly all employees subject to the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir.1998) (citing *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74, 111 S. Ct. 1127, 1133-34, 113 L. Ed.2d 51 (1991)).  Judicial review of such allegations is "highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78, 111 S. Ct. at 1135.  Indeed, a plaintiff's obligation to plead sufficient conduct to support a claim of unfair representation has been characterized as an "enormous burden." *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, 2005 WL 1661093, *7 (E.D.N.Y. July 14, 2005); *aff'd* 204 F. App'x 40 (2nd Cir. 2006).

In order to pursue a claim for the breach of fair representation, a plaintiff is required to allege both (1) the employer's breach of a collective bargaining agreement and (2) the union's breach of its duty of fair representation *vis-a-vis* the union members. *White v. White Rose Food, Div. of DiGiorgio Corp.*, 237 F.3d 174, 178 (2d Cir. 2001).  The latter breach cannot be supported only by proof of

21

negligence.  *See Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989).

Rather, to prove that a union has breached its duty of fair representation, a plaintiff

must prove that the union's actions or inactions "are either 'arbitrary,

discriminatory, or in bad faith.'" *O'Neill,* 499 U.S. at 67, 111 S. Ct. at 1130.  In

claims of breach of the duty of fair representation against a union that pursues a

termination through arbitration, the plaintiff must also establish that the union's

conduct "seriously undermine[d] the arbitral process."  *Barr*, 868 F.2d at 43

(internal quotation marks and citations omitted).  To meet this burden, a plaintiff

must show more than a possible change in the outcome of the arbitration. *Id.*

In a duty of fair representation case, to be "arbitrary," the alleged actions,

considered in light of the factual and legal landscape at the time of the union's

actions, must fall so far outside a wide range of reasonableness as to be irrational.

*O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130; *Vaughn v. Air Line Pilots Ass'n, Int'l*,

604 F.3d 703, 709 (2d Cir. 2010).  To be "discriminatory," the allegations must

plausibly allege disparate treatment that was intentional, severe, and unrelated to

legitimate union objectives. *Vaughn,* 604 F.2d at 709 (internal quotation marks

omitted).  "Bad faith" requires allegations that the union engaged in "fraud,

dishonesty, [or] other intentionally misleading conduct . . . with an improper intent,

purpose, or motive."  *Id.* at 709-10 (internal quotation marks omitted).

The fact that an employee's claim is later determined to be meritorious is not evidence that the union breached its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 192-95, 87 S. Ct. 903, 918-919, 17 L. Ed.2d 842 (1967). Indeed, a union does not breach its duty of fair representation even when it makes mistakes or errors in judgment in the enforcement of a collective bargaining agreement. *United Steelworkers v. Rawson*, 495 U.S. 362, 372-73, 110 S. Ct. 1904, 1911-12, 109 L. Ed.2d 362 (1990). In *Barr*, for instance, the Second Circuit determined that tactical errors by the union in failing to present witnesses during the grievance process and failing adequately to prepare for grievance meetings and arbitration did not constitute a breach of the duty of fair representation. 868 F.2d at 43. In so holding, the court noted that,

> [i]n hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous. The decisions taken here by [the union] were tactical in nature. At most, they may have been errors of judgment. In any event, they were not so egregious as to be evidence of bad faith and failure to fairly represent [the plaintiff].

*Id.* The court held, therefore, that:

> [t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach. . . . 'As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.'

*Id.* at 43-44 (quoting *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 645 (2nd Cir. 1985)); *see also Barr,* 868 F.2d at 44 (finding that union did not breach its duty of fair representation by failing to conduct polygraph examination to exonerate grievant).

Furthermore, as noted above, judicial review of a claimed breach of the duty of fair representation is highly deferential. *O'Neill*, 499 U.S. at 78, 11 S. Ct. at 1130; *Vaughn*, 604 F.3d at 709. Thus, a plaintiff must further show a causal connection between the union's wrongful conduct and the plaintiff's injuries. *Vaughn*, 604 F.3d at 709; *Spellacy*, 156 F.3d at 126.

C.  **The District Court Properly Granted Summary Judgment in Favor of the Union**

Applying the appropriate legal principles in this case, the district court properly granted summary judgment to the Union and against Ustad.

1.  **Plaintiff/Appellant Is Not the Victim of a Company-Union Plot to Fire Him and Prevent Him from Getting His Job Back**

As a threshold matter, Plaintiff/Appellant asserts that he is the victim of a plot by the Union and Company, and that the Union admitted that it breached its duty of fair representation by not informing him that F/O Thompson had filed an ASAP report and not advising him to file one too. (Br. & Special App. For Pl-Appellant ("Appellant's Br.") at 12, 19, 24, 41, 42.) Plaintiff/Appellant is

24

incorrect; the record does not reflect what he asserts. First, there was no plot or collusion between the Company and the Union to fire him or to prevent him from getting his job back. Plaintiff/Appellant himself admitted that he has no knowledge that any representative of Local 747 sought to prevent his reinstatement or harbors ill will toward him. (JA 96, 228, 232, 1601-1604.)

Second, with respect to Plaintiff/Appellant's allegations concerning Union representative Christopher Bartlett, the record shows that the Bartlett testified during his deposition he did not assume the "duty" to call Appellant/Plaintiff within the first 24 hours of Flight 986 because he believed another Union representative had taken on that "responsibility." (JA 850-51, ¶ 30; JA 1176-77) Bartlett is a pilot (*see* JA 1174), not a lawyer, and any fair reading of his deposition answers shows that by using such words, he was not "admitting" that the Union had a legal obligation to advise Ustad to file an ASAP report, let alone that there was a breach of the duty of fair representation because of Bartlett's failure to do so, s*ee Barr*, 868 F. 2d at 43.

## 2.    The Union Did Not Violate its Duty of Fair Representation by Mishandling Plaintiff/Appellant's Grievance/Arbitration

The district court correctly determined that the Union far exceeded its duty of fair representation as applied to Plaintiff/Appellant. With respect to its handling

of Plaintiff/Appellant's grievance and arbitration, the Union aggressively pursued Plaintiff/Appellant's grievance and arbitration. In this regard:

- The Union participated in NAA's pre-discharge investigatory hearing and counseled Plaintiff/Appellant in that hearing (JA 79, ¶ 126);

- The Union timely filed a grievance on Plaintiff/Appellant's behalf the same day that NAA advised him that it was firing him (JA 81, ¶¶ 134, 137);

- The Union participated in the pre-arbitration grievance hearing, where it gathered additional information relating to the discharge and raised objections and challenges to various points raised by NAA's representatives (JA 82, ¶¶ 140, 141);

- The Union timely demanded arbitration through the System Board of Adjustment upon NAA's refusal to rescind Plaintiff/Appellant's discharge (*Id.*, ¶ 144);

- The Union assigned an experienced and very capable union-side labor lawyer to handle the System Board of Adjustment arbitration hearing (JA 84, ¶ 153);

- Flynn, the Union's attorney, obtained and reviewed documents, interviewed F/O Thompson, sought the input of experienced pilots, and prepared Ustad

to testify in advance of the arbitration by email, by telephone, and in person (JA 84, ¶ 155; JA 85-86, ¶¶ 158-66; JA 88, ¶ 175);

- The Union provided additional support to Flynn by assigning two experienced pilot representatives (one of whom was also a law school graduate who is type-rated in a Boeing 767 aircraft) to assist him on technical details involved in the arbitration (JA 84, ¶ 155);

- During the preparation period Flynn frequently and timely communicated with Appellant and, at Plaintiff/Appellant's request, Plaintiff/Appellant's wife, who is also a pilot and a former flight instructor (JA 84, ¶ 156; JA 85, ¶¶ 158-60; JA 86, ¶164);

- The Union engaged in a two-day arbitration during which Flynn presented arguments, examined and cross-examined witnesses, presented documentary evidence in support of the grievance challenging Plaintiff/Appellant's discharge, and objected to documentary evidence proffered by NAA (JA 89-90, ¶¶ 187-88, 191);

- The Union ensured that the arbitration proceeding was memorialized in a transcript and then used that 364-page transcript in order to prepare its post-hearing brief (*Id.*, ¶ 187);

- The Union, through Flynn, prepared and shared with Plaintiff/Appellant and Plaintiff/Appellant's wife a draft legal brief in support of its position challenging Plaintiff/Appellant's discharge (JA 90-91, ¶ 194);

- The Union, through Flynn, timely filed the final version of that 39-page legal brief with the arbitrator (JA 91, ¶¶ 195-196).

Unfortunately, despite all of these efforts on behalf of Plaintiff/Appellant, the Union did not prevail at the arbitration, and Arbitrator Conway upheld Plaintiff/Appellant's discharge, finding that NAA had just cause to fire him for intentional misconduct relating to the his piloting of Flight 986. (JA 91, ¶ 197.) Plaintiff/Appellant's disappointment in that result is understandable, but, as the district court correctly determined, it simply does not translate to a viable cause of action against the Union for breach of its duty of fair representation. (JA 2001-05.)

As the district court also correctly noted, Plaintiff/Appellant's claims against the Union merely amount to second-guessing of tactical litigation decisions taken by Union attorney Flynn. (JA 2002-04.) Although Plaintiff/Appellant couches his actions in this regard as an allegation that Flynn did not prepare the arbitration case properly and only instead handled it in a perfunctory manner, these allegations are belied by Plaintiff/Appellant's and his wife's written praise of the Union's and Flynn's efforts just after the close of the hearing and after reviewing his draft brief

to the arbitrator.  (*See* JA 90-91, ¶¶ 193-194.)  Indeed, even after receiving the unfavorable decision, Plaintiff/Appellant and his wife expressed deep disappointment in the result, but expressly "cast no blame."  (JA 94, ¶¶ 205-06.) Significantly, in advising Flynn and Herron that they would seek to appeal the arbitration decision, Plaintiff/Appellant and his wife claimed that they would do so because of their belief that the arbitrator's ruling was simply wrong, and *"not because we feel the IBT misrepresented us."*  (*See* JA 94, ¶ 206 (emphasis supplied).)

Plaintiff/Appellant claims that in upholding his discharge Arbitrator Conway got the facts wrong and that the Union breached its duty of fair representation by not providing him with the "correct" facts.  (Appellant's Br. at 54.) Plaintiff/Appellant made similar claims in the court below and the court properly rejected them.  (*See* JA 2001-04.)  In this regard, as he claimed in the court below, Plaintiff/Appellant argues that Flynn failed to elicit expert testimony regarding the AFIRS data and had he done so, the AFIRS data would have exonerated him.  (JA 2001-03.)  After considering the data and discussing it with Herron, an experienced B-767 pilot, Flynn, in the exercise of his professional judgment, decided that the AFIRS data would hurt, not help, Plaintiff/Appellant's discharge case.  (JA 86-87,

¶¶ 165-70.)[3]  He therefore sought to exclude the data entirely, based on a sound

argument arising directly from the collective bargaining agreement under which

the discharge arose.  (*See* JA 87-88, ¶¶ 171-72.)  Despite his strenuous efforts to

exclude the AFIRS data, Arbitrator Conway conditionally allowed the data to be

used at the hearing for corroboration purposes.  (JA 90, ¶ 191.)  In his post-hearing

arbitration brief, Flynn again sought to exclude the AFIRS data.  (JA 510, 525,

536-38.)  Plaintiff/Appellant and his wife reviewed the brief before Flynn filed it

and they praised it.  (JA 90-91, ¶ 194.)  They did not consider that the Union

should have focused detailed attention on the AFIRS data itself until <u>after</u>

Arbitrator Conway rendered his unfavorable decision.  Plaintiff/Appellant's post-

arbitration decision claim that the Union should have used the AFIRS data

offensively to attack NAA's discharge decision is simply "Monday morning

quarterbacking," and does support a finding of a breach of the duty of fair

representation.

---

[3] Flynn was not wrong.  Although Plaintiff/Appellant claims that the AFIRS data would have
exonerated him if Flynn had used it offensively in the arbitration, it would not have done so.  In
this regard, after conducting a full evidentiary hearing in which the AFIRS data was used by both
counsel for the agency and counsel for Plaintiff/Appellant and both sides presented non-expert
witness testimony interpreting that data, the administrative law judge for  the Federal Aviation
Administration ("FAA") issued a ruling suspending Plaintiff/Appellant's license.  (JA 1637-47.)
Although the National Transportation Safety Board ("NTSB") vacated and remanded that license
suspension decision on other grounds (JA 1638-39), Appellant chose to settle the agency's
charges against him by admitting to having violated federal safety regulations involving
excessive speed  (JA 96, ¶¶ 209-210).   The data showing those speed violations was recorded in
the AFIRS data.  (JA 85-86, ¶ 162.)

Additionally, and in any event, as the court below noted, the critical and exculpatory "facts" that Plaintiff/Appellant alleges Flynn failed to present were not "facts" at all, but were instead explanations, i.e., interpretations and arguments, regarding the AFIRS data. (*See* JA 2003-04.) The court below correctly noted that Arbitrator Conway's decision upholding Plaintiff/Appellant's discharge turned not on the interpretation of the AFIRS data but on his crediting of the testimony of F/O Thompson over Plaintiff/Appellant. (*Id.*) Thus, the facts were not the issue in Plaintiff/Appellant's discharge; Plaintiff/Appellant's credibility was, and the Arbitrator found it lacking.

Plaintiff/Appellant also claims that the Union breached its duty of fair representation because Flynn did not think to make a "winning argument" to Arbitrator Conway. (Appellant's Br. at 56.) In this regard, Plaintiff/Appellant claims that although he did not file an ASAP report - despite repeated suggestions and recommendations that he do so - he was still immunized from discipline by his employer because F/O Thompson had filed one. (*Id.*) Plaintiff/Appellant's claim is not well grounded and he does not explain why such an argument would have been anything other than frivolous.

To give him the benefit of the doubt, by accusing Flynn of not making a "winning argument" Plaintiff/Appellant may be alluding to instructions given by

the NTSB to the ALJ in its remand order regarding his administrative license suspension hearing.  (*See* JA 1676.)  It that order, the NTSB instructed the administrative law judge ("ALJ") to refrain from considering a memorandum prepared by F/O Thompson that purportedly contained the same information as was contained in his ASAP report.  (JA 1645-46.)  The NTSB further instructed the ALJ to refrain from considering any testimony referring to that memorandum until he addressed and resolved the issue of whether F/O Thompson's ASAP report immunized not just himself but also Plaintiff/Appellant from federal agency enforcement action against his license.  (*Id.*)  Because Plaintiff/Appellant entered into a settlement agreement with the Federal Aviation Administration ("FAA") admitting that he had violated federal safety regulations, the ALJ did not have the opportunity to address or resolve the question posed to him by the NTSB.  Even if he had done so, however, and even if he had determined that F/O Thompson's ASAP report immunized Plaintiff/Appellant, that immunization was with respect to *federal enforcement actions* against Plaintiff/Appellant's license; it would <u>not</u> have immunized Plaintiff/Appellant from discipline by his *employer*. Plaintiff/Appellant's claimed "winning argument," therefore, would not have won anything at all in his discharge arbitration between the Union and NAA and would have been summarily rejected.

32

**D.** **The District Court Properly Rejected Plaintiff/Appellant's Claim that the Union Violated the Duty of Fair Representation Regarding Plaintiff/Appellant's Failure to File an ASAP Report**

Had there been no intentional misconduct, Plaintiff/Appellant could have been immunized from discipline by his employer, NAA, but only if he had done what he repeatedly was urged to do but did not do, namely, file his own ASAP report. Having failed to file an ASAP report, Plaintiff/Appellant now attempts to foist blame upon the Union, claiming that it breached its duty of fair representation by failing to advise him to file an ASAP report within twenty-four hours the completion of Flight 986. The district court rightly dismissed Plaintiff/Appellant's claim in this regard. (JA 2004-05.) First, the district court properly dismissed this claim as irrelevant, because the court was bound by Arbitrator Conway's finding that Plaintiff/Appellant had been discharged for intentional misconduct, and such intentional conduct was not subject to immunity under the ASAP reporting program. (JA 2004.)

Plaintiff/Appellant takes issue with the district court's reasoning in this regard, arguing that it effectively puts the cart ahead of the horse. (Appellant's Br. at 57.) In so arguing, however, Plaintiff/Appellant misapprehends the relevant legal principles governing fair representation claims and the binding strength of labor arbitration awards. Plaintiff/Appellant's ASAP-related fair representation

claim does not involve the Union's conduct relating to the arbitration proceeding, but instead relates to the period of time *before* Plaintiff/Appellant was even discharged. Because Plaintiff/Appellant failed to meet his burden that the Union breached its duty of fair representation by mishandling the discharge arbitration proceeding, Plaintiff/Appellant is, as the district court rightly held, bound by Arbitrator Conway's factual and legal findings in his arbitration decision. (*See* JA 2004.)

Although a union can breach its duty of fair representation if its handling of an employee's grievance is arbitrary, discriminatory, or in bad faith, in order to overturn an arbitration award and its findings, "the breach of duty by the Union must have tainted the arbitrator's decision. The breach must have contributed to the arbitrator's making an erroneous decision." *Wood v. Int'l Bhd. of Teamsters, Local 406*, 807 F.2d 493, 500 (6th Cir. 1986) (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 572, 96 S. Ct. 1048, 1060, 47 L. Ed.2d 231 (1976)). Here, because the arbitrator found that Plaintiff/Appellant's misconduct was intentional, the Union's alleged failure relating to Plaintiff/Appellant's ASAP-related fair representation claim cannot possibly have tainted the arbitrator's decision. That means, therefore, that Plaintiff/Appellant's ASAP-related claim is, as the district court held, irrelevant. (*See* JA 2004.)

The district court also correctly determined that the Union did not in any event breach its duty of fair representation by failing to advise Plaintiff/Appellant to file an ASAP report within 24-hours of the completion of Flight 986. (JA 2004-05.) First, Plaintiff/Appellant's ASAP-related fair representation claim against the Union fails because it rests on the incorrect assumption that the Union had any duty to advise him to file an ASAP report in the first place. The ASAP program exists to create a non-punitive environment in which pilots are encouraged to err on the side of reporting any and all safety related concerns and events to their airline employer. (*See* JA 641, ¶ 28.) The basic assumption of the ASAP program is that the responsibility for disclosure begins and remains with the crewmember who experiences or observes a safety related event. (*Id.*) That responsibility exists independent of the Union-member relationship and of the immunity provisions of the ASAP program. Indeed, it is for this reason that the district court correctly noted that to the extent the Union did not advise Plaintiff/Appellant to submit an ASAP report with 24 hours of the completion of Flight 986, it cannot be held to

have impeded Appellant's own right to file the report himself. (JA 2005.)[4]

Second, as the district court correctly found, the record in this case conclusively establishes that Plaintiff/Appellant knew of a possible noncompliance with airline safety regulations in connection with Flight 986 the moment he landed at JFK. (*See* JA 2004-05.) Such knowledge is evidenced foremost by the NASA report that Plaintiff/Appellant filed on December 22, 2009, at a time Plaintiff/Appellant claims he remained "in the dark" about the specific allegations made against him by F/O Thompson. (JA 76, ¶ 106; Appellant's Br. at 3, 24.)

---

[4] Plaintiff/Appellant also misconstrues the 24-hour condition on disciplinary immunity (which, because it involved a sole-source event, did not apply) as a 24-hour limit on disclosure. As noted by the district court, within the ASAP program, there are two types of reports: sole source and non-sole source. (*See* JA 1997.) A report is sole source if there is no other evidence of the event. (*Id.*) A sole source report will be accepted by the ERC "regardless of the time frame within which they are submitted, provided they otherwise meet the acceptance criteria." (JA 66, ¶ 35.) For non-sole source reports to be accepted by the ERC, time requirements apply, but the event that triggers the clock depends on what the crewmember knew and when. If the crewmember had knowledge of the possible noncompliance with airline safety regulations during the flight, a waivable 24-hour requirement runs from the end of the flight. (*Id.*) If the crewmember had no knowledge of the possible noncompliance, the 24-hour requirement runs from when the crewmember learned of it or from the ERC's invitation to file an ASAP report. (*Id.*) Such invitation is only made if the ERC determines that the crewmember did not or could not have known of the possible violation. (JA 1997.) Plaintiff/Appellant assumes that if he had filed an ASAP report it would not have been timely because it was not a sole source report. In fact, the ERC determined that F/O Thompson's report *was* sole source. (JA 74, ¶ 93.) The ASAP MOU specifically states that there can be more than one sole-source report. (JA 65, ¶ 32.) Thus, if Plaintiff/Appellant had listened to Union representative and ERC member Kemp and ERC administrator Weller, or had simply chosen to err on the side of filing an ASAP report, the ERC's sole-source determination would have applied equally to his report and no 24-hour requirement would have applied. Given these facts, the Union could not have breached its duty of fair representation by failing to ensure that Plaintiff/Appellant submitted an ASAP report within 24 hours of Flight 986.

Plaintiff/Appellant's NASA report is remarkably complete with defenses to several allegations made by Thompson, including the flap speed exceedance, the EICAS messages and the failure to make logbook entries. (JA 76-77, ¶ 109.) Plaintiff/Appellant's knowledge of a possible safety event is also demonstrated by his failure to enter the EICAS message in the logbook. (*See* JA 76-77, ¶¶ 108-11; JA 493-95.) Moreover, no commercial pilot with the extensive experience that Plaintiff/Appellant has could have missed the meaning and import of F/O Thompson's comments at the end of Flight 986, such that he knew or should have known at a minimum that Thompson believed a possible noncompliance with airline safety regulations had taken place.

Furthermore, Plaintiff/Appellant was sufficiently familiar with the ASAP program to know that the most responsible course of action was to submit an ASAP report within 24-hours of the flight or thereafter. All pilots were provided with a copy of the ASAP MOU in their Flight Operations Manuals. (JA 67, ¶ 41.) Plaintiff/Appellant had received ASAP program materials from the ERC and he was aware of the basic requirements of the ASAP program by virtue of his participation in collective bargaining negotiations. (*See* JA 63-64, ¶¶ 25-27.) Plaintiff/Appellant was aware that without filing an ASAP report he would not be eligible for disciplinary immunity. To the extent Plaintiff/Appellant claims he was

confused about the ASAP requirements, he was equally capable of reading the

ASAP MOU as any other Union representative. He was also capable of picking up

the phone and returning the call of Lori Weller, the ASAP/ERC program

coordinator and administrator who, well after he was removed from active duty,

left him a message advising him that an ASAP had been filed regarding Flight 987

and informing  him that he could file an ASAP too, if he felt one was warranted.

(*See* JA 77, ¶ 113; JA 868, ¶ 113.)

Given what Plaintiff/Appellant knew about Flight 986 and the ASAP

program, there is only one conclusion that can be drawn from the fact that he did

not file an ASAP report: he did not want to risk incriminating himself in the event

the ERC rejected his report based on a finding of intentionally unsafe conduct. The

arbitration panel found that NAA had just cause to fire Plaintiff/Appellant for

having piloted Flight 986 in an intentionally unsafe manner.  (JA 801-802.)  Thus,

even if the Union otherwise owed a duty of fair representation to ensure that pilots

file ASAP reports (which it does not, as explained above), the Union cannot be

found to have violated that duty with respect to Plaintiff/Appellant here, because

his report would not have provided immunity in any event.  Whatever problems

Plaintiff/Appellant believes exist on account of his failing to file an ASAP report

are problems that he brought upon himself, and none of them support a claim

against the Union for the breach of the duty of fair representation.

## CONCLUSION

For all the foregoing reasons, the Union respectfully request that the Court

uphold the district court's grant of summary judgment in its favor and against

Plaintiff/Appellant, and affirm the judgment of the district court.


Dated:      New York, New York
            October 17, 2014


                                    Respectfully submitted,

                                    ____/s/ Franklin K. Moss____
                                    Franklin K. Moss (FM 9161)
                                    Spivak Lipton LLP
                                    1700 Broadway, 21st Floor
                                    New York, New York 10019
                                    Tel: (212) 765-2100
                                    Fax: (212) 765-8954

                                    *Attorneys for Appellees*
                                    *International Brotherhood of*
                                    *Teamsters and International*
                                    *Brotherhood of Teamsters, Local 747*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 9,045 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: October 17, 2014
      New York, New York

                            /s/ Franklin K. Moss
                                 FRANKLIN K. MOSS